Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CESAR SARAUSAD,
           *Petitioner-Appellee,*

v.

CAROL PORTER,
           *Respondent-Appellant.*

No. 05-35062

D.C. No.
CV-02-02547-JCC

CESAR SARAUSAD,
           *Petitioner-Appellant,*

v.

CAROL PORTER,
           *Respondent-Appellee.*

No. 05-35192

D.C. No.
CV-02-02547-JCC

OPINION

Appeals from the United States District Court
for the Western District of Washington
John C. Coughenour, Chief Judge, Presiding

Argued and Submitted
November 15, 2005—Seattle, Washington

Filed March 7, 2007

Before: Stephen Reinhardt, William A. Fletcher, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge William A. Fletcher;
Partial Concurrence and Partial Dissent by Judge Reinhardt;
Dissent by Judge Bybee

**COUNSEL**

John J. Samson, Office of the Washington Attorney General, Olympia, Washington, for the respondent-appellant.

Patricia S. Novotny, and David B. Zuckerman, Seattle, Washington, for the petitioner-appellee.

---

**OPINION**

W. FLETCHER, Circuit Judge:

Petitioner Cesar Sarausad brings a petition for habeas corpus under 28 U.S.C. § 2254, challenging his second-degree murder and two attempted second-degree murder convictions. We hold that the evidence was sufficient to support the convictions under *Jackson v. Virginia*, 443 U.S. 307 (1979). However, based on *In re Winship*, 397 U.S. 358 (1970), *Sandstrom v. Montana*, 442 U.S. 510 (1979), and *Estelle v. McGuire*, 502 U.S. 62 (1991), we hold that ambiguous jury instructions on accomplice liability, in combination with other factors, unconstitutionally relieved the State of its burden of proof of an element of the crimes with which he was charged.

## I.   General Background

Sarausad is a naturalized citizen who immigrated as a child from the Philippines. At the time of the events in question, Sarausad was a 19-year-old student at the University of Washington in Seattle. He had recently graduated from Ingraham High School in Seattle. While still in high school, Sarausad had tutored other minority students in mathematics. Sarausad had become friends with some of his tutees and had eventually joined their gang, the 23rd Street Diablos ("the Diablos").

On the morning of March 23, 1994, Sarausad picked up three of his friends, Gerard Abad, Levi Arakelyan, and Lucas Gosho. These three were either Diablo members or associates. The four then drove in Sarausad's car to the Pink Pantry convenience store where they met Jerome Reyes, Gaurav Nayar, Brian Ronquillo, Michael Marckx, and Rocky Galbay, also members or associates of the Diablos. Reyes told the group that he had recently been chased from Ballard High School by members of another gang, the Bad Side Posse ("the BSP"). The group decided to go to Ballard to confront the BSP.

The group first went to Shorewood High School, across the street from the Pink Pantry, to see if another member of the Diablos, Michael Vicencio, would join them. Vicencio told them that he would meet them later at the 7-Eleven. The group then went, without Vicencio, to Ballard High School in Sarasaud's and Nayar's cars. Sarausad's car was in the lead. They drove past an area of the school where BSP members were thought to be, shouting insults, showing gang signs, and waving bandanas. They came back a few minutes later and stopped their cars near a group of six to ten students. They got out of the cars, and a yelling and pushing match ensued. After a short time, someone yelled that the police were there. The group got back into the cars and left. As they drove away, some of the Ballard students yelled that they were "weak."

The group then went to Nayar's house, but Sarausad, Abad, and Reyes went to the 7-Eleven to get Vicencio. Vicencio followed Sarausad back to Nayar's house in his car. Before Vicencio entered the house, Ronquillo met him outside and asked for Vicencio's gun. Vicencio gave the gun to Ronquillo. There is no evidence that Sarausad was present when Ronquillo asked for and was given the gun. At Nayar's house the group listened to music, danced, and initiated a new member into the gang. They left when Nayar told them that his mother would be coming home soon.

The group got into two cars, this time Sarausad's and Vicencio's. Though he was carrying Vicencio's gun, Ron-

quillo rode in Sarausad's rather than Vicencio's car. Sarausad stopped his car a few blocks away from Ballard High School, and Vicencio pulled up beside him. There was a brief conversation between the people in the two cars. They then continued on to the school with Sarausad leading, as he had done on the first trip.

Melissa Fernandes, Ryan Lam, and Tam Nguyen were standing outside the school. As he approached, Sarausad slowed down to perhaps five miles per hour and drove closer to the curb. As Sarausad slowed the car, Ronquillo fired between four and ten shots from the front passenger seat. Lam and Nguyen dropped to the ground and were unharmed. Melissa Fernandes was hit. She died the next day at the hospital. Brent Mason, a student who had just stepped out of shop class, was struck in the leg by a bullet fragment. Sarausad and Vicencio both drove away rapidly, with Sarausad's car still in the lead.

After leaving the school, the two cars stopped and Ronquillo transferred Vicencio's gun to Vicencio's car. Then Sarausad and Vicencio both drove to the Northgate mall. Sarausad left the others at the mall and went home. The gun used in the murder was later destroyed by other members of the group.

The State prosecuted Ronquillo (the shooter), Sarausad (the driver), and Reyes (a passenger in the back seat of Sarausad's car). The State offered plea agreements and lenient treatment to others in the group on the condition that they testify against Ronquillo, Sarausad, and Reyes.

All three defendants were charged with one count of first-degree murder, two counts of attempted first-degree murder, and one count of second-degree assault. The theory of the State's case against Sarausad and Reyes was that they were accomplices, and were therefore guilty of murder despite not having fired any shots. The only seriously contested issue at

Sarausad's trial was whether he had the requisite knowledge to be an accomplice to murder. At the time of his trial, it was unclear under Washington law whether an accomplice had to have knowledge that the principal merely intended to commit *a* crime, or whether the accomplice had to know that the principal intended to commit *the particular* crime in question.

Ronquillo was convicted on all counts as charged. Sarausad was convicted of the lesser-included crimes of one count of second-degree murder and two counts of attempted second-degree murder, and of one count of second-degree assault. The jury hung, and a mistrial was declared, as to Reyes.

Sarausad's counsel moved for a new trial. In a declaration in support of the motion, Sarausad's counsel stated that during a post-verdict interview, jurors stated that the jury had been confused about what was required to prove accomplice liability. The court denied the motion. Sarausad's counsel then moved for reconsideration, attaching declarations in which two jurors stated that the jury had been confused about accomplice liability. The court denied the motion for reconsideration. Sarausad was then sentenced to more than 27 years in state prison.

Sarausad's convictions were affirmed on direct appeal by the Washington Court of Appeals. *State v. Ronquillo*, No. 38540-5-I, 1998 WL 87641, at *9 (Wash. Ct. App. Mar. 2, 1998). The Washington Supreme Court denied review. *State v. Ronquillo*, 966 P.2d 1277 (Wash. 1998). Sarausad then sought collateral review through a personal restraint petition ("PRP") in the Washington Court of Appeals. The Court of Appeals denied relief, *see State v. Sarausad*, 39 P.3d 308 (Wash. Ct. App. 2001), and the Washington Supreme Court denied review.

Sarausad then sought a writ of habeas corpus in federal district court under 28 U.S.C. § 2254, challenging his second-degree murder and two attempted second-degree murder con-

victions. He did not challenge his second-degree assault conviction. In a thorough Report and Recommendation, the magistrate judge recommended that Sarausad's habeas petition be granted on two grounds — first, that there was insufficient evidence to convict Sarausad, and, second, that the jury instructions, in combination with other factors, unconstitutionally relieved the State of its burden of proof. The district court agreed with the magistrate judge's recommendation on both grounds and granted the writ subject to the State's election to retry Sarausad.

The State appeals. Sarausad cross-appeals, contending, inter alia, that the district court erred in holding that double jeopardy does not bar retrial after reversal of a conviction for insufficient evidence. Sarausad's release has been stayed pending appeal.

We reverse the decision of the district court on the sufficiency-of-the-evidence ground. However, we affirm on the ground that the State was improperly relieved of its burden of proof. We need not reach Sarausad's claims on cross-appeal.

## II.   Standard of Review

We review de novo the district court's decision to grant a habeas petition under 28 U.S.C. § 2254. *Ramirez v. Castro*, 365 F.3d 755, 762 (9th Cir. 2004) (as amended). Because Sarausad filed his petition after April 16, 1996, the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies. *Stevenson v. Lewis*, 384 F.3d 1069, 1071 (9th Cir. 2004). AEDPA provides that a federal habeas court shall not grant a writ of habeas corpus from a state court unless the adjudication of the claim

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Section 2254(d)(1) establishes a two-part test. First, there must be clearly established Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 381, 412 (2000). Second, the state court decision must either be "contrary to" or an "unreasonable application" of that precedent. *Id.* at 384-86. The state court is not required to cite the controlling Supreme Court precedent so long as its decision is not "contrary to" or an "unreasonable application" of that precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

The terms "contrary to" and "unreasonable application" have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court's decision is "contrary to" clearly established Supreme Court precedent if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A state court's decision is an unreasonable application of clearly established Supreme Court precedent "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*; *see Gibson v. Ortiz*, 387 F.3d 812, 814 (9th Cir. 2004). The "unreasonable application" clause requires more than that the state court decision be incorrect. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Rather, a federal habeas court making an " 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively

unreasonable." *Williams*, 529 U.S. at 409. This analysis imposes a " 'highly deferential standard for evaluating state-court rulings' " and " 'demands that state court decisions be given the benefit of the doubt.' " *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003) (citations omitted).

In determining whether a state court decision is "contrary to" or an "unreasonable application" of federal law under § 2254(d)(1), we look to the last reasoned decision of the state court. *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). We therefore review the Washington Supreme Court's written order denying Sarausad's petition for review of the Court of Appeals' decision. To the extent that this denial relies on the Washington Court of Appeals' denial of the PRP, we review that decision as well.

## III.  Discussion

### A.  Sufficiency of the Evidence

**[1]** Under clearly established Supreme Court case law, due process requires that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof — defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979) (explaining *In re Winship*, 397 U.S. 358, 364 (1970)). To determine whether this due process right has been violated, the appropriate inquiry before the passage of AEDPA was a straightforward question of "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). We have recently joined our sister circuits in using § 2254(d)(1) to evaluate a state court's sufficiency-of-the-evidence determination under *Jackson*. *See Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005) (as amended); *see also Ponnapula v. Spitzer*, 297 F.3d 172, 179

(2d Cir. 2002); *Sanford v. Yukins*, 288 F.3d 855, 863 (6th Cir. 2002); *Piaskowski v. Bett*, 256 F.3d 687, 691 (7th Cir. 2001); *Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir. 2001). Under 28 U.S.C. § 2254(d)(1), we inquire whether a state court determination that the evidence was sufficient to support a conviction was an "objectively unreasonable" application of *Jackson*. *See Juan H.*, 408 F.3d at 1275 n.13; *see also Smith v. Mitchell*, 437 F.3d 884, 889 (9th Cir. 2006) ("Our task under AEDPA . . . is to determine whether the decision of the [state court], holding that the evidence was sufficient to convict [the defendant], was an unreasonable application of *Jackson*.").

Section 2254(d)(1) plainly applies to *Jackson* cases. A state court must decide under *Jackson* whether the evidence, viewed in the light most favorable to the prosecution, would allow any rational trier of fact to find the defendant guilty beyond a reasonable doubt. If the state court affirms a conviction under *Jackson*, a federal court is asked under § 2254(d)(1) to decide whether the state court adjudication "resulted in a decision that . . . involved an unreasonable application of[ ] clearly established Federal law, as determined by the Supreme Court of the United States." That is, we are asked to decide whether the state court's application of *Jackson* was "objectively unreasonable." *Juan H.*, 408 F.3d at 1275 n.13.

**[2]** By contrast, § 2254(d)(2) is not readily applicable to *Jackson* cases. Under § 2254(d)(2), the federal court must decide whether the state court adjudication "resulted in a decision that was based on an unreasonable *determination of the facts* in light of the evidence presented in the State court proceeding." (Emphasis added.) Section 2254(d)(2) does not describe the task of a court in performing a *Jackson* analysis. A court under *Jackson* makes no "determination of the facts" in the ordinary sense of resolving factual disputes. Rather, the court views the evidence in the light most favorable to the prosecution without resolving any disputed factual questions. Our task under AEDPA in reviewing a state court's holding applying *Jackson* is not to decide whether that court unrea-

sonably determined disputed facts. It is, rather, to decide whether the state court unreasonably applied the *Jackson* test of "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

**[3]** We therefore evaluate a state court's resolution of a *Jackson* sufficiency-of-the-evidence claim in all cases under § 2254(d)(1) rather than § 2254(d)(2), as we have already held in *Juan H*. The First Circuit has adopted guidelines for applying the "objective unreasonableness" test under § 2254(d)(1) to a state court decision applying *Jackson*. We believe that these guidelines are useful, though not all of them will necessarily apply in any particular case. The guidelines are as follows:

> (1)  The focus of the inquiry is on the state court decision;
>
> (2)  Even with the deference due by statute to the state court's determinations, the federal habeas court must look to the "totality of the evidence" in evaluating the state court's decision;
>
> (3)  The failure of the state court to consider at all a key argument of the defendant may indicate that its conclusion is objectively unreasonable; however, the paucity of reasoning employed by the state court does not itself establish that its result is objectively unreasonable;
>
> (4)  The failure of a state court to give appropriate weight to all of the evidence may mean that its conclusion is objectively unreasonable; and
>
> (5)  The absence of cases of conviction precisely parallel on their facts does not, by itself, establish objective unreasonableness.

*Hurtado*, 245 F.3d at 18.

In performing a *Jackson* analysis, " '[c]ircumstantial evidence and inferences drawn from [the record] may be sufficient to sustain a conviction.' " *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (quoting *United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir.), *amended by* 798 F.2d 1250 (9th Cir. 1986)). However, " 'mere suspicion or speculation cannot be the basis for creation of logical inferences.' " *Id.* (quoting *Lewis*, 787 F.2d at 1323). Where behavior is consistent with both guilt and innocence, the burden is on the State to produce evidence that would allow a rational trier of fact to conclude beyond a reasonable doubt that the behavior was consistent with guilt. *United States v. Bautista-Avila*, 6 F.3d 1360, 1363 (9th Cir. 1993). However, "the prosecution need not affirmatively 'rule out every hypothesis except that of guilt[.]' " *Wright v. West*, 505 U.S. 277, 296 (1992) (citation omitted). A jury's credibility determinations are "entitled to near-total deference under *Jackson*." *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).

**[4]** The *Jackson* standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Chein v. Shumsky*, 373 F.3d 978, 983 (9th Cir. 2004) (en banc) (internal quotation marks omitted). Under Washington law, Sarausad is guilty based on an accomplice liability theory if he "acted with knowledge that his . . . conduct would promote or facilitate the [murder]." *State v. Cronin*, 14 P.3d 752, 759 (Wash. 2000); *see State v. Roberts*, 14 P.3d 713, 736 (Wash. 2001) (as amended). Under *Roberts* and *Cronin*, it is not enough under Washington law that the accomplice had knowledge that the principal would engage in some kind of crime. He must have had knowledge that the principal would engage in the crime actually committed. *Roberts*, 14 P.3d at 736; *Cronin*, 14 P.3d at 759. He need not be a lawyer. That is, he does not need to have "specific knowledge of the elements of the participant's crime." *In re Domingo*, 119 P.3d 816, 820 (Wash. 2005) (en banc). But he

does need to have " 'general knowledge' of the crime charged" against the principal. *Id.*

In ruling on Sarausad's PRP, the Washington Court of Appeals held that "when viewed in the light most favorable to the State" the circumstantial evidence presented at trial was "sufficient to allow a rational jury reasonably to infer that Sarausad knowingly facilitated the drive-by shooting." *Sarausad v. State*, 39 P.3d 308, 319 (Wash. Ct. App. 2001). In so holding, the court did not cite to controlling United States Supreme Court precedent, but such citation is not required. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). The Washington Supreme Court denied review in an unpublished order. We review the denial of Sarausad's PRP to determine whether it was based on an "objectively unreasonable" application of *Jackson*.

In support of its holding that there was sufficient evidence to sustain Sarausad's conviction, the Court of Appeals wrote:

> [Witnesses] Gosho and Marckx testified that "capping" was discussed on the return trip to the school. At some point before the shooting, Ronquillo tied a bandana over the lower part of his face and pulled the gun out of his pants. While parked side by side with the other carload of Diablos, Sarausad said, "Are you ready?" Sarausad then drove the car in such a manner as to facilitate a drive-by shooting, not in such a manner as to stop, park the vehicle and engage in fisticuffs. An expert in gangs testified about the kind of gang mentality that requires the gang to avenge its honor when one of its members is disrespected by a rival gang, and that causes the gang members to see violence is an acceptable means of regaining lost respect.

*Sarausad*, 39 P.3d at 319 (footnote omitted). The Washington Supreme Court affirmed the Court of Appeals' holding on evidentiary sufficiency without discussion of the evidence.

**[5]** The Court of Appeals' statement that the evidence showed that "Gosho and Marckx testified that 'capping' was discussed on the return trip to the school" is incorrect. Contrary to the Court of Appeals' statement, Gosho never testified that "capping" (meaning "shooting") was discussed on the return trip to the school. Gosho did testify about a conversation concerning the possibility of a shooting, but that conversation took place before the return trip to the school. The distinction is important because Sarausad was driving the car in which Gosho was riding and almost certainly would have heard the conversation had it taken place in the car. But if the conversation took place before the return trip to the school, as Gosho testified, there is no direct evidence that Sarausad heard it. Gosho never testified that Sarausad participated in or heard the conversation.

Gosho testified as follows:

Q   (Prosecutor)  You were asked about the plan that day. What was your understanding of the range of options with respect to shooting?

A   (Gosho)  I knew that it was one of the options, but I didn't seriously think it was going to be because there were, you know, there was other options.

Q   With respect to shooting being an option, do you recall what was said about that as an option?

A   I can't recall who said what. But, you know, somebody must've brought it up, that we could shoot as an option.

Q   I'm sorry, what?

A   I can't recall one person saying that. But, you know, it was brought up as an option, so yeah.

Q   What was said specifically with respect to shoot-
    ing being an option?

A   Well just that, you know, it was a possibility that
    we could, you know.

Q   Was there anything mentioned with respect to a
    gun and shooting?

A   I don't recall exactly. But, you know, there must
    have been a gun if we were going to shoot.

The prosecutor sought to refresh Gosho's memory with a
police report:

Q   (Prosecutor) . . . . Do you recall at that point in
    the interview when Detective Maning was ask-
    ing you about the discussion regarding the possi-
    bilities with respect to shooting?

A   (Gosho) Yes, I do.

Q   Do you recall Detective Maning saying to you,
    "Okay. So somebody, well, we've got a gun, we
    can shoot them"? What was your response?

A   It was, "Right."

Q   You said, "Right"?

A    Yeah.

Q   And Detective Maning responded by saying, "I
    mean, I don't know. Is that what was said?"
    What was your response then?

A   I said, "Well, I don't recall specifically."

Q    Detective Maning then asked you, "But some-
     body said, 'We've got a gun.' " And what was
     your response?

A    I said, "Yeah."

On cross-examination, Gosho explained further:

Q    (Reyes's attorney) . . . . The answer to Detective
     Maning's question at that time, did you under-
     stand that to mean that somebody had a gun
     right then in [Gaurav Nayar's] house or in the
     car, or that there was a gun available to that
     group at some point?

A    (Gosho) Well, they had said that a shooting was
     a possibility. So obviously, you know, yeah,
     there must've been access to a gun if there was
     going to be — I mean, if it was a possibility.

Q    You answered some questions of some of the
     other attorneys that this was a general conversa-
     tion and you didn't take it seriously. Is that cor-
     rect?

A    Right.

Q    You didn't think that a shooting was actually
     being planned —

A    Right.

Also contrary to the Court of Appeals' statement, Marckx
did not testify that "capping" was discussed on the return trip
to the school. Marckx had ridden in the back seat of Sarau-
sad's car on the return trip. He testified that an unidentified
person in the back seat asked "Are we going to cap?" immedi-
ately before Ronquillo began to shoot. There was no "discus-

sion" because no one had time to answer the question before the shooting started. The point is important because if there had been a "discussion" in the car before the shooting started, the discussion would have put Sarausad on notice of the possibility of such a shooting when he slowed his car in front of the school.

Marckx testified as follows:

> Q   (Prosecutor) Let me take you back briefly to the shooting itself when you guys were parked on 14th Avenue Northwest where you were headed down to the school. Was there any discussion about capping or shooting?
>
> A   (Marckx) I heard someone say, "Are we going to cap?"
>
> Q   What does the term "cap" mean?
>
> A   Shoot.
>
> Q   That was in your car?
>
> A   Yes.

Marckx testified that the question had been asked immediately before the actual shooting:

> Q   (Ronquillo's attorney) Now, you say that prior to the shooting you heard somebody say something about capping.
>
> A   (Marckx) Yeah.
>
> Q   And that meant what to you?
>
> A   "Are we going to shoot?"

Q    What did you say?

A    I didn't say anything, because right when it was said Brian [Ronquillo] was shooting.

Q    You mean, he was shooting as it was being said?

A    Immediately after it was said.

The testimony continued:

Q    (Sarausad's attorney) . . . . This was a comment something to the effect of, "Are we going to cap." Right?

A    (Marckx) Um-hmm.

Q    This happened just a moment or two before the actual shooting, is that correct?

A    Yeah.

Q    In fact, there was a single query, single question.

A    Yeah.

Q    There was no response to that other than the actual shooting. Is that correct?

A    Yeah.

Q    Before anyone could say anything in response to that, you noticed, you heard and realized the shooting was taking place.

A    Yeah.

[6] Thus, it was "objectively unreasonable" for the Washington Court of Appeals to state that "Gosho and Marckx tes-

tified that 'capping' was discussed on the return trip to the school." For purposes of our AEDPA review, we disregard this purported evidence in evaluating the Court of Appeals' conclusion that the *Jackson* standard had been satisfied. However, given other evidence in the record, not limited to that described by the Court of Appeals, we hold that the court's application of *Jackson* was not objectively unreasonable.

Some of that other evidence was accurately described by the Court of Appeals. The court wrote that at some unspecified point before the shooting, Ronquillo tied a bandana over the lower part of his face; that when the two cars were parked side-by-side before going back for the second trip to Ballard High School, Sarausad asked, "Are you ready?"; and that Sarausad slowed his car in front of the school in a manner that facilitated a drive-by shooting.

Much of the other evidence was not described by the Court of Appeals. This evidence largely involves questions of when a gun was seen, when a gun was displayed or used, and when the use of a gun was discussed. Though circumstantial, this evidence goes to the likelihood that Sarausad knew that Ronquillo had a gun on the return trip to Ballard High School and knew that Ronquillo intended to use it.

The record contains evidence that it was Sarausad who went to get Vicencio at the 7-Eleven after the first trip to Ballard High School. Vicencio testified at trial that "others in the gang" knew that he had a gun. Sarausad was a member of the gang. Gosho testified that various options were discussed at Nayar's house for a return trip to the school. He said, "[W]e might just look at them or fight them or yell at them or fight them or possibly shoot them. The prosecutor then asked, "You said possibly shoot them. Was that an option that was discussed with everybody in the house?" Gosho answered, "Yes."

Two witnesses testified that they thought they saw a gun in the hands of a Diablo during the first trip to the school. One

of them testified that a Diablo had pulled a gun part way out of his pants. The other witness said that a Diablo had pointed something that "looked like a gun" at him. "It was either pointed at my neck or my face. . . . I just saw a gun was pointed at me."

Another witness testified that she had seen a red car circling several times around Ballard High School with five or six male "kids" in it. Sarausad's car was red. At one point, the car stopped and one of the passengers got out to pick up a hat. The witness described the passenger as having "a darker complexion." This same witness testified that she later saw what she thought was a gun being held outside that same car:

> A:  [As the car] came around the corner I saw what I thought somebody pulling something back in. And at that point, I turned to my girlfriend and I said, 'I think I saw a gun.' And the car, you know, sped off. . . .
>
> Q:  Could you tell where in the car the individual might have had a weapon was?
>
> A:  Behind the driver. That's where I saw the arm come back in.
>
> Q:  What made you think it was a weapon?
>
> A:  Well, I think it's not — it wasn't like anything I've seen as a gun, except the barrel. I could see like a glint off of the barrel on it.

The witness testified further, "And then shortly after that, I don't know how long, heard the shots. . . . I would say at least six. . . . I mean it was constant, bang bang bang bang bang."

Sarausad admitted in his trial testimony that he had told a detective, in an interview after the shooting, that he suspected

that members of the other gang at Ballard High School had guns. However, Sarausad testified that he had not meant to tell the detective that he suspected this before the return to the school, but rather that he had begun to suspect this only afterwards. Sarausad further testified that, when the two cars stopped on their way back to the school, he had instructed those in the other car, "Follow me." The prosecutor asked, "Beyond follow you, what was the plan?" Sarausad answered, "Well that we would drive by, drive towards them." Sarausad testified that he was "not sure" whether Ronquillo had already pulled a bandana over his face when the car was stopped before getting back to the school.

**[7]** For purposes of reviewing the Court of Appeals' holding that there was sufficient evidence under *Jackson* to support Sarausad's conviction, we assume that the jury was properly instructed on Washington's accomplice liability law. That is, we assume, for present purposes, that the jury understood that Sarausad could be convicted of murder on a theory of accomplice liability only if he knew that Ronquillo intended to commit murder. The Court of Appeals described some of the evidence accurately, described some of it inaccurately, and failed to mention some of it. We have considered the evidence in the light most favorable to the prosecution, as we are required to do under *Jackson*. We have not considered (or described here) the evidence that contradicted or minimized the importance of the evidence favoring the prosecution. The evidence supporting the conclusion that Sarausad knew that Ronquillo planned to shoot students on the return trip to Ballard High School was somewhat thin, and it was circumstantial. However, based on our review of all the evidence in the record, we conclude that the Court of Appeals was not "objectively unreasonable" in concluding that the *Jackson* standard was satisfied.

### B. Impermissible Shifting of Burden of Proof

**[8]** Clearly established Supreme Court case law provides that "the Due Process Clause protects the accused against

conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Winship*, 397 U.S. at 364. As a consequence, a jury instruction is constitutionally defective if it "ha[s] the effect of relieving the State of the burden of proof enunciated in *Winship*." *Sandstrom v. Montana*, 442 U.S. 510, 521 (1979). Clearly established Supreme Court case law specifies the standard for reviewing an ambiguous instruction: "[W]e inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citation omitted).

The test stated in *Estelle* for ambiguous instructions was first articulated in deciding an Eighth Amendment challenge to a jury instruction in *Boyde v. California*, 494 U.S. 370, 380 (1990), but *Estelle* employed the test to decide a Due Process Clause challenge to a jury instruction outside the Eighth Amendment context. *Estelle*, 502 U.S. at 66-67. *Estelle* made a point of stating that its articulation and application of the test was established law. The Court wrote, "So that we may once again speak with one voice on this issue, we now disapprove the standard of *Cage* [*v. Louisiana*, 498 U.S. 39 (1990)] and *Yates* [*v. Evatt*, 500 U.S. 391 (1991)], and reaffirm the standard set out in *Boyde*." *Estelle*, 502 U.S. at 73 n.4; *see also Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (per curiam) (applying the established rule that "a jury instruction violates due process if . . . there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution") (internal quotation marks omitted); *Patterson v. Gomez*, 223 F.3d 959, 962 (9th Cir. 2000) (same). The Court in *Estelle* emphasized that, in determining whether there was a "reasonable likelihood" of misunderstanding, "the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). The Court noted in *Boyde* that "arguments of counsel gener-

ally carry less weight with a jury than do instructions from the court," but they may sometimes "have a decisive effect on the jury." *Boyde*, 494 U.S. at 384.

### 1.   Background

The only seriously contested issue during Sarausad's trial was whether he knew that Ronquillo intended to commit murder on the return trip to Ballard High School. At the time of the trial, it was widely thought that Washington law did not require the accomplice to know what particular crime the principal intended to commit. During closing argument, the prosecutor carefully and repeatedly articulated this view of Washington law. She explained to the jury that accomplice liability was based on an "in for a dime, in for a dollar" theory. That is, if the accomplice knew that the principal intended to commit some crime — any crime — the accomplice was liable for whatever crime the principal committed, even if the accomplice had no idea that the principal intended to commit that particular crime. Thus, under this view of the law, even if Sarausad believed that Ronquillo intended only to commit assault, Sarausad was nevertheless liable as an accomplice for the murder actually committed by Ronquillo.

In her closing argument, the prosecutor said:

> Under the laws of the State of Washington, people who help commit crimes, people who set the wheels in motion, people who assist in the commission of crimes are called accomplices or aiders and abettors, as we more commonly know them to be. And in the eyes of the law, you are no less guilty because you drive the getaway car or because you solicit a crime to occur. You're no less guilty for helping than you are for pulling the trigger.
>
> The defendants, Mr. Sarausad and Mr. Reyes, are classic accomplices. And let's talk a little bit about

the law of accomplice liability as it exists in our state. You're going to have two instructions that talk about accomplice liability . . . .

. . . .

Let me give you a good example of accomplice liability. A friend comes up to you and says, "Hold this person's arms while I hit him." You say, "Okay, I don't like that person anyway." You hold the arms. The person not only gets assaulted, he gets killed. You are an accomplice and you can't come back and say, "Well, I only intended this much damage to happen." Your presence, your readiness to assist caused the crime to occur and you are an accomplice. The law in the State of Washington says, if you're in for a dime, you're in for a dollar. If you're there or even if you're not there and you're helping in some fashion to bring about this crime, you are just as guilty.

. . . .

The defendant, Mr. Sarausad, classic accomplice in this case. He's the driver, he's the wheelman. . . .

Both these cases, ladies and gentlemen, the defendants, Mr. Sarausad and Mr. Reyes, they were both present and they were certainly ready to assist. . . .

They were all there that day, especially these three, ready to back each other up in whatever happened. In for a dime, they were in for a dollar and they were sticking together.

In response, Sarausad's lawyer argued that Washington accomplice liability was not based on "in for a dime, in for

a dollar." In rebuttal, the prosecutor again stated that this was, indeed, Washington law. She said:

> And I've told you the old adage, you're in for a dime, you're in for a dollar. If their logic was correct, they're not ever an accomplice to anything. The getaway driver for a bank robbery would say, "I just told him to rob them, I didn't tell him to shoot him, I didn't do anything." The example I gave you earlier, "I just told my friend to hold the arms down of this person while he hit him, I didn't tell him to kill him, I'm not guilty of anything." If you're in for a dime, you're in for a dollar.

> . . . . In for a dime, you're in for a dollar.

> The defendant, Mr. Ronquillo, did not act alone. He acted with the assistance of the driver, Mr. Sarausad[.]

The accomplice liability instructions in Sarausad's case were based on Wash. Rev. Code § 9A.08.020. Jury Instruction 45 stated the general concept of accomplice liability under Washington law: "You are instructed that a person is guilty of *a crime* if it is committed by the conduct of another person for which he is legally accountable. A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of *the crime*." Instruction 46 then provided a definition of accomplice liability:

> A person is an accomplice in the commission of *a crime* if, with knowledge that it will promote or facilitate the commission of *the crime*, he or she either:

> > (1) solicits, commands, encourages, or requests another person to commit *the crime* or

(2) aids or agrees to aid another person in
planning or committing *the crime*.

Instruction 47 defined intent: "A person acts with intent or
intentionally when acting with the objective or purpose to
accomplish a result which constitutes *a crime*." Instruction 48
defined knowledge: "A person knows or acts knowingly or
with knowledge when he or she is aware of a fact, facts or cir-
cumstances or result described by law as being *a crime*. . . .
Acting knowingly or with knowledge also is established if a
person acts intentionally."[1] (Emphasis added to all instruc-
tions.)

---

[1]Quoted in their entirety, the accomplice liability instructions were:

    No. 45: You are instructed that a person is guilty of a crime
if it is committed by the conduct of another person for which he
is legally accountable. A person is legally accountable for the
conduct of another person when he is an accomplice of such
other person in the commission of the crime.

    No. 46: A person who is an accomplice in the commission of
a crime is guilty of that crime whether present at the scene or not.

    A person is an accomplice in the commission of a crime if,
with knowledge that it will promote or facilitate the commission
of the crime, he or she either:

    (1) solicits, commands, encourages, or requests another person
    to commit the crime or

    (2) aids or agrees to aid another person in planning or commit-
    ting the crime.

    The word "aid" means all assistance whether given by words,
acts, encouragement, support or presence. A person who is pres-
ent at the scene and ready to assist by his or her presence is aid-
ing in the commission of the crime. However, more than mere
presence and knowledge of the criminal activity of another must
be shown to establish that a person present is an accomplice.
    No. 47: A person acts with intent or intentionally when acting
with the objective or purpose to accomplish a result which consti-
tutes a crime.

    No. 48: A person knows or acts knowingly or with knowledge
when he or she is aware of a fact, facts or circumstances or result
described by law as being a crime.

On the third day of its deliberations, the jury sent out the following note:

> Request clarification on instruction No. 11 & No. 12 [first-degree murder instruction as to Sarausad] element (3) [that the intent to cause the death was premeditated]; does the "intent" apply to (the defendant only) or to (the defendant or his accomplice)?

The judge responded: "Refer to instructions 46 and 47 and consider your instructions as a whole."

On the fifth day of deliberations, the jury asked to "rehear" Sarausad's testimony. The judge responded that the "[t]estimony will not be repeated." On the sixth day of deliberations, the jury sent out the following note:

> Reference: Instruction No. 17 [second-degree murder instruction as to Sarausad] in "the crime of murder in the second degree (intentional)."
>
> Question: Does intentional apply to only the defendant or only his accomplice?

The judge responded that the jury should "[r]efer to instructions 45 & 46 and consider the instructions as a whole."

Finally, on the seventh day of deliberations, the jury sent out the following note:

---

If a person has information which would lead a reasonable person in the same situation to believe that facts exist which are described by law as being a crime, the jury is permitted but not required to find that he or she acted with knowledge.

Acting knowingly or with knowledge also is established if a person acts intentionally.

> We are having difficulty agreeing on the legal definition and concept of "accomplice."
>
> Question: When a person willing[ly] participates in a group activity, is that person an accomplice to any crime committed by anyone in the group?

After conferring with counsel, the judge told the jury to "[r]eread instructions # 45, 46, 47 and 48, and consider your instructions as a whole." The next day, the jury returned a verdict finding Sarausad guilty of second-degree murder, two attempted second-degree murders, and second-degree assault.

Sarausad's counsel moved for a new trial. In a declaration in support of the motion, counsel stated that during a post-verdict interview, at which both the trial judge and counsel were present, the jury foreman and other members of the jury stated that they did not think Sarausad intended to kill anyone, that they had been confused by the concept of accomplice liability, and that they had been swayed by the prosecutor's "in for a dime, in for a dollar" theory. The court denied the motion for a new trial.

Sarausad's counsel then moved for reconsideration. This time, he supplemented his motion with sworn declarations from two jurors. Both jurors stated that they found the accomplice liability instructions to be very confusing and that they did not think Sarausad intended to facilitate the shootings. The court denied the motion for reconsideration. Sarausad was then sentenced to more than 27 years in state prison.

On direct appeal to the Washington Court of Appeals, Sarausad argued that "in for a dime, in for a dollar" was an inaccurate statement of Washington law of accomplice liability. Specifically, in the words of the Court of Appeals, Sarausad argued "that to convict a person as an accomplice to a substantive crime that requires proof of intent, the State must prove that the accomplice intended to help the principal com-

mit that particular crime." *State v. Ronquillo*, No. 35840-5-I, 1998 WL 87641, at *8 (Wash. Ct. App. Mar. 2, 1998).

The Court of Appeals disagreed with Sarausad's argument. The court first quoted part of the Washington accomplice liability statute. In relevant part, that statute provides:

> (1)   A person is guilty of *a crime* if it is committed by the conduct of another person for which he is legally accountable.
>
> (2)   A person is legally accountable for the conduct of another person when:
>
> . . .
>
> > (c)   He is an accomplice of such other person in the commission of *the crime*.
>
> (3)   A person is an accomplice of another person in the commission of *a crime* if:
>
> > (a)   With knowledge that it will promote or facilitate the commission of *the crime*, he
> >
> > > (i)   solicits, commands, encourages, or requests such other person to commit *it*; or
> > >
> > > (ii)   aids or agrees to aid such other person in planning or committing *it*[.]

Wash. Rev. Code § 9A.08.020 (1994) (emphasis added). The court then quoted Instruction 46, which closely tracked the statutory language. The only difference between the statute and the instruction was that the word "it," which appears twice in the statute, was each time replaced by the words "the crime" in the instruction.

The Court of Appeals concluded that the statute, as well as the jury instructions, were based on the "in for a dime, in for a dollar" theory of accomplice liability. The court agreed with the prosecution's statement of the law to the jury during her closing argument. It held that the statute and the instructions did *not* require that an accomplice have knowledge of the particular crime the principal intended to commit.

The Court of Appeals wrote:

> Sarausad misstates the law in Washington when he asserts that to be convicted as an accomplice, the State must prove that the accomplice had the mental state required for commission of the charged offense. His argument that an accomplice is only liable for that substantive offense which he willfully sought to bring about has specifically been rejected in Washington.
>
> In order to convict an accomplice of intentional murder, the State need not show that the accomplice had the intent that the victim would be killed. RCW 9A.08.020(3)(a) has no such requirement.
>
> Accomplice liability in Washington is premised on the following principles: (1) To convict of accomplice liability, the State need not prove that principal and accomplice shared the same mental state, (2) accomplice liability predicates criminal liability on general knowledge of a crime, rather than specific knowledge of the elements of the principal's crime, and (3) an accomplice, having agreed to participate in a criminal activity, runs the risk that the primary actor will exceed the scope of the preplanned illegality.

*Ronquillo*, 1998 WL 87641, at \*9 (citations omitted). The Washington Supreme Court denied review without comment. *State v. Ronquillo*, 966 P.2d 1277 (Wash. 1998).

In two other cases, decided shortly thereafter, the Washington Supreme Court repudiated the "in for a dime, in for a dollar" theory that had been the basis for the Court of Appeals' affirmation of Sarausad's conviction. In *State v. Roberts*, 14 P.3d 713 (Wash. 2001) (as amended), Jury Instruction 7 had defined accomplice liability as follows:

> You are instructed that a person is guilty of <u>a crime</u> if it is committed by the conduct of another person for which he is legally accountable. A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of *a crime*.
>
> A person is an accomplice in the commission of <u>a crime</u> . . . if, with knowledge that it will promote or facilitate *its commission*, he either:
>
> (a) solicits, commands, encourages or requests another person to commit <u>the crime</u>; or
>
> (b) aids another person in planning or committing <u>the crime</u>[.]

*Id.* at 735 (italics in original; underlining added). In rejecting the "in for a dime, in for a dollar" theory of accomplice liability and disapproving the jury instruction, the Washington Supreme Court wrote, "The Legislature . . . intended the culpability of an accomplice not extend beyond the crimes of which the accomplice actually has 'knowledge,' . . . . In contrast, jury instruction 7 here essentially allowed the jury to impose strict liability on Roberts. The instruction, therefore, improperly departed from the language of the statute." *Id.* at 735-36.

In *State v. Cronin*, 14 P.3d 752 (Wash. 2000), the Washington Supreme Court "adhere[d]" to its decision in *Roberts*:

> [T]he fact that a purported accomplice knows that the principal intends to commit " 'a crime' " does not necessarily mean that accomplice liability attaches for any and all offenses ultimately committed by the principal. *See Roberts*, 14 P.3d at 736. In our judgment, in order for one to be deemed an accomplice, that individual must have acted with knowledge that he or she was promoting or facilitating *the* crime for which that individual was eventually charged.

*Id.* at 758 (emphasis in original).

Sarausad brought his PRP in the Washington Court of Appeals after the Washington Supreme Court decided *Roberts* and *Cronin*. Now sitting with three different judges from those who heard Sarausad's direct appeal, the Court of Appeals wrote that the previous Court of Appeals panel had misinterpreted the Washington statute when it denied relief in Sarausad's direct appeal based on the "in for a dime, in for a dollar" theory. *State v. Sarausad*, 39 P.3d 308, 313-14 (Wash. Ct. App. 2001). Recognizing that *Roberts* and *Cronin* had repudiated that reading of the statute, the Court of Appeals now held that Sarausad's jury instructions "mirrored" the state statute on accomplice liability "and thus did not suffer from the fatal flaw in *State v. Roberts*." *Id.* at 313. The Court of Appeals did not mention the fact that the prior panel on direct appeal in Sarausad's case had held essentially the opposite. That is, it did not mention that the prior panel of the Court of Appeals had held that the Washington statute and Sarausad's jury instructions meant the opposite of what the Washington Supreme Court later held the statute to mean in *Roberts* and *Cronin*, and that the prior panel had held that the statute and jury instructions were based on the now-repudiated "in for a dime, in for a dollar" theory of accomplice liability.

Sarausad specifically argued to the second Court of Appeals panel that the prosecutor's "in for a dime, in for a

dollar" argument misstated the law of accomplice liability and misled the jury, thereby relieving the State of its burden to prove every element of the crime beyond a reasonable doubt. He argued that "the prosecutor erroneously assumed, and argued, that the jury could find Sarausad guilty as an accomplice to murder if he had the purpose to facilitate an offense of any kind whatsoever, even a shoving match or fist fight." *Id.* at 316-17. The Court of Appeals responded, "But this is not an accurate description of the prosecutor's actual argument." *Id.* at 317. It continued, "[T]he prosecutor did *not* in fact argue that even if Sarausad drove to Ballard High School the second time having the purpose to facilitate only another shoving match or a fist fight, he nevertheless was guilty of murder." *Id.* at 318 (emphasis in original). "Not once did the prosecutor suggest to the jury that it could or should convict Sarausad even if it believed that he returned to Ballard High School for the purpose of facilitating nothing more than another shoving match or a fistfight . . . ." *Id.* at 319.

These statements by the Court of Appeals are flatly contradicted by the record. As is obvious from the trial transcript (quoted at length above), the prosecutor argued clearly, emphatically, and repeatedly that Sarausad could be convicted of accomplice liability for murder even if he believed that Ronquillo intended merely to commit assault. We quote again only a small portion of the prosecutor's argument:

> Let me give you a good example of accomplice liability. A friend comes up to you and says, "Hold this person's arms while I hit him." You say, "Okay, I don't like that person anyway." You hold the arms. The person not only gets assaulted, he gets killed. You are an accomplice and you can't come back and say, "Well, I only intended this much damage to happen." . . . The law in the State of Washington says, if you're in for a dime, you're in for a dollar.

Based in part on its incorrect description of the prosecutor's argument, the Court of Appeals denied Sarausad's PRP.

In an unpublished written order signed by the Court Commissioner, the Washington Supreme Court denied review. The Court Commissioner, like the Court of Appeals, did not acknowledge that the Court of Appeals had held on direct appeal that the jury in Sarausad's case had been permitted to convict based on the "in for a dime, in for a dollar" reading of the Washington statute. Instead, the Commissioner wrote, "[H]ere the trial court correctly instructed the jury that it could convict Mr. Sarausad of murder or attempted murder as an accomplice only if it found he knowingly aided in the commission 'the' [sic] crime charged." In denying the PRP, the Commissioner, like the Court of Appeals, flatly misstated the record in describing the prosecutor's argument to the jury. The Commissioner wrote, "The prosecutor never suggested Mr. Sarausad could be found guilty if he had no knowledge that a shooting was to occur."

## 2. Discussion

Under *Estelle v. McGuire*, 502 U.S. 62 (1991), we first ask whether the jury instructions were ambiguous. If the instructions were ambiguous, we then ask "in the context of the instructions as a whole and the trial record" whether there was a "reasonable likelihood that the jury has applied the instruction in a way that violates the Constitution." *Id.* at 72 (citations and internal quotation marks omitted). We consider these questions in turn.

### a. Ambiguous Jury Instructions

The sole contested legal issue in Sarausad's trial was whether he could be convicted as an accomplice to murder and attempted murder if he did not know that Ronquillo intended to commit murder. For three reasons, we conclude that the instructions given in his case were ambiguous with respect to this issue.

[9] First, nowhere in the jury instructions is there an explicit statement that an accomplice must have knowledge of

the actual crime the principal intends to commit. The more important instructions are numbers 45 and 46. They state, in relevant part:

> [Number 45:] You are instructed that a person is guilty of *a crime* if it is committed by the conduct of another person for which he is legally accountable. A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of *the crime*.

> [Number 46, in part:] A person is an accomplice in the commission of *a crime* if, with knowledge that it will promote or facilitate the commission of *the crime*, he or she either:

> > (1) solicits, commands, encourages, or requests another person to commit *the crime* or

> > (2) aids or agrees to aid another person in planning or committing *the crime*.

(Emphasis added.) The critical issue is the definition of the term "a crime," as that term is used at the beginning of Instruction 46. That term could mean "the crime" actually committed by the principal (whatever it turned out to be), or it could mean "the crime" the accomplice had knowledge the principal intended to commit. It would be easy to add a sentence to the instructions stating which of the two possible definitions is correct, but the instructions contain no such sentence.

**[10]** Second, the Washington Supreme Court held that a very similar instruction in *Roberts* allowed the jury to find accomplice liability based on the "in for a dime, in for a dollar" theory. Instruction 7 in *Roberts* is almost identical to

Instruction 45 in Sarausad's case. Instruction 7 in *Roberts* provided, in relevant part:

> You are instructed that a person is guilty of *a crime* if it is committed by the conduct of another person for which he is legally accountable. A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of *a crime*.

*Roberts*, 14 P.3d at 735 (emphasis added). The only difference between the two instructions is that the words "the crime" at the very end of Instruction 45 in Sarausad's case are replaced by the words "a crime" at the end of the just-quoted portion of Instruction 7 in *Roberts*. The Washington Supreme Court noted that the Washington accomplice statute used the words "the crime" in this place, where Instruction 7 used the words "a crime." The Court held that under Washington law, an accomplice could be held liable for the crime committed by the principal only if he knew that the principal would commit that particular crime. *Id.* It then reversed Roberts' conviction because Instruction 7 "essentially allowed the jury to impose strict liability on Roberts." *Id.* at 736.

Because it uses the words "the crime" where Instruction 7 in *Roberts* used the words "a crime," Instruction 45 in Sarausad's case does not invite an erroneous construction to the same degree as the flawed instruction in *Roberts*. Indeed, in using the words "the crime," Instruction 45 tracks the wording in the Washington accomplice liability statute more closely than Instruction 7. But the simple change from "a crime" to "the crime" in Instruction 45 does not, in our view, make the jury instructions in Sarausad's case unambiguous, for the basic problem identified above remains: There is no sentence in the instructions specifically instructing the jury that a person can be guilty of "a crime" as an accomplice only if that person knows that "a crime" is "the crime" the principal intends to commit.

**[11]** Third, and perhaps most revealing, the Washington Court of Appeals on direct appeal held that the instructions given in Sarausad's case were consistent with the Washington statute, and that both the instructions and the statute were based on the "in for a dime, in for a dollar" theory of accomplice liability. Sarausad had argued to that court that Washington law required that an accomplice must know "the crime" the principal intended to commit. The Court of Appeals disagreed, holding that it was sufficient under Washington law that the accomplice know that the principal intended to commit "a crime," whether it be the actual crime committed or some other crime. In reaching that conclusion, the court understood both the accomplice liability statute and the jury instructions to be based on this theory of accomplice liability.

The judges on the Court of Appeals are well-trained professionals, skilled in reading legal texts and experts in Washington law. Those judges, on direct appeal, read the statute and the jury instructions as instructing the jury to convict Sarausad as an accomplice *even if he did not know* that Ronquillo intended to commit murder. Given the Court of Appeals' reading of the statute and the jury instructions on Sarausad's direct appeal, we are hard pressed to read the very same statute and instructions as unambiguously instructing the jury to do precisely the opposite — to convict Sarausad *only if he knew* that Ronquillo intended to commit murder.

The dissent argues that the jury instructions could not have been deficient because they closely tracked the language of Washington's accomplice liability statute. The argument contains an obvious flaw. If a statute is ambiguous, any jury instruction that mirrors the statutory language must also be ambiguous. The fact that an instruction quotes from a statute does nothing to make either the statute, or the instruction, more understandable.

Criminal statutes are sometimes upheld and applied only after a court has given a narrowing or clarifying gloss to the

statutory language. Many statutes, for example, fail to specify a scienter element. The Supreme Court has often held that such statutes have an implicit mens rea requirement and that trial courts must instruct jurors not to convict defendants without sufficient proof of their state of mind. *Liparota v. United States*, 471 U.S. 419 (1985), is typical. Liparota had been convicted under a federal statute that made it unlawful to "knowingly . . . acquire[ ]" food stamps in an unauthorized manner. *Id.* at 420 n.1 (quoting 7 U.S.C. § 2024(b)(1)). Although the district court's instructions closely tracked the language of the statute, the Supreme Court reversed Liparota's conviction. As the Court noted, the statute did not "explicitly spell[ ] out the mental state required" to convict a defendant. *Id.* at 424. Under one reading, it was enough that the defendant knowingly acquired food stamps. Under another reading, it was necessary to prove not only that the defendant knowingly acquired food stamps, but also that he knew that the acquisition was unauthorized. The Court insisted on the latter construction: "[T]he Government must prove that the defendant knew that his acquisition or possession of food stamps was in a manner unauthorized by statute or regulations." *Id.* at 433. The district court's instructions in *Liparota*, despite their adherence to the statutory language, were defective because they did not adequately convey the required mental state.

Other cases similarly illustrate that jury instructions must frequently clarify, not merely parrot, the statute of conviction. As in *Liparota*, the Supreme Court in *Staples v. United States*, 511 U.S. 600 (1994), considered a statute that was silent on the subject of mens rea. The Court concluded that the jury should have been instructed that it could not return a conviction for unlawful possession of an automatic weapon unless the defendant knew that the "characteristics of his weapon" brought it within the scope of the statute. *Id.* at 604; *see also Ratzlaf v. United States*, 510 U.S. 135, 149 (1994) (holding that the jury should have been instructed that it could not convict the defendant unless he knew that his currency structur-

ing activities were unlawful); *United States v. Speach*, 968 F.2d 795, 796 (9th Cir. 1992) (reversing a defendant's conviction for transporting hazardous waste under a "linguistically ambiguous" statute because the jury instructions failed to require proof that the defendant knew that the recipient of the waste lacked a permit); *cf. Godfrey v. Georgia*, 446 U.S. 420, 437 (1980) (Marshall, J., concurring in the judgment) (explaining that it is inappropriate "[t]o give the jury an instruction in the form of the bare words of the statute" when those words are "hopelessly ambiguous").

**[12]** The Washington courts have had serious difficulty parsing the Washington accomplice liability statute's knowledge requirement, at times holding that it permits an "in for a dime, in for a dollar" theory, and at times holding the opposite. The jury instructions in Sarausad's case, which essentially tracked the statutory language, were no less confusing than the statute itself. We therefore conclude that the jury instructions were, at the very least, ambiguous on the question of whether Sarausad could be convicted of murder and attempted murder on a theory of accomplice liability without proof beyond a reasonable doubt that Sarausad knew that Ronquillo intended to commit murder.

### b.   Likelihood of Misapplication

**[13]** Establishing that the jury instructions were ambiguous, and that the jury could therefore have misunderstood them, is not enough to establish a constitutional violation under *Estelle*. Sarausad must also establish that there is "a reasonable likelihood that the jury *has applied* the challenged instruction in a way that violates the Constitution." *Estelle*, 502 U.S. at 72 (emphasis added, internal quotation marks omitted). Under *Estelle*, we ask whether there is a "reasonable likelihood" that the jury applied the instruction in a way that relieved the State of its burden to prove beyond a reasonable doubt every element of the crime of accomplice liability for murder under Washington law. *Id.* A defendant "need not

establish that the jury was more likely than not to have been impermissibly inhibited by the instruction" in order to satisfy the "reasonable likelihood" standard. *Boyde*, 494 U.S. at 380. For four reasons, we believe the "reasonable likelihood" standard has been met.

**[14]** First, the evidence supporting the conclusion that Sarausad knew that Ronquillo intended to commit murder on the return trip to Ballard High School was somewhat thin. As indicated above, there was no direct evidence that Sarausad knew that Ronquillo intended to commit murder, and the Washington Court of Appeals on direct review overstated the strength of the limited circumstantial evidence. We described that evidence above from the perspective of a *Jackson* analysis, viewing it in the light most favorable to the prosecution. Even described from that perspective the evidence against Sarausad was thin. But there was also evidence that contradicted or minimized the strength of the evidence, which we did not describe.

The dissent appears to misunderstand the import of our argument that the evidence against Sarausad was thin. We do not claim that the weakness of the evidence caused the jury to misunderstand the instructions. Rather, we contend that the fact that the jury convicted Sarausad despite the thin evidence that Sarausad knew of Ronquillo's intent to commit murder suggests that the jury incorrectly believed that such proof was not required.

**[15]** Second, the prosecutor argued clearly and forcefully for the "in for a dime, in for a dollar" theory of accomplice liability. The prosecutor could not have been clearer in her explanation of that theory. For example, she argued to the jury in rebuttal:

> And I've told you the old adage, you're in for a dime, you're in for a dollar. If their logic was correct, they're not ever an accomplice to anything. The

getaway driver for a bank robbery would say, "I just told him to rob them, I didn't tell him to shoot him, I didn't do anything." The example I gave you earlier, "I just told my friend to hold the arms down of this person while he hit him, I didn't tell him to kill him, I'm not guilty of anything." If you're in for a dime, you're in for a dollar.

**[16]** Third, in its notes sent to the judge during deliberations, the jury demonstrated substantial confusion about what the State was required to prove. In its first note, the jury asked for "clarification" on whether " 'intent' appl[ied] to (the defendant only) or to (the defendant or his accomplice)?" In its second note, it asked, "Does intentional apply to only the defendant or only his accomplice?" Finally, in its third note, it wrote, "We are having difficulty agreeing on the legal definition and concept of 'accomplice.' Question: When a person willing[ly] participates in a group activity, is that person an accomplice to any crime committed by anyone in the group?"

**[17]** Fourth, after the Washington Supreme Court had clarified the meaning of the Washington statute in *Roberts* and *Cronin*, the Washington courts were able to deny Sarausad's PRP only after misstating the record and ignoring the prosecutor's emphatic and repeated "in for a dime, in for a dollar" argument. The Court of Appeals wrote, "[T]he prosecutor did *not* in fact argue that even if Sarausad drove to Ballard High School the second time having the purpose to facilitate only another shoving match or a fist fight, he nevertheless was guilty of murder." *Id.* at 318 (emphasis in original). It added, "Not once did the prosecutor suggest to the jury that it could or should convict Sarausad even if it believed that he returned to Ballard High School for the purpose of facilitating nothing more than another shoving match or a fistfight . . . ." *Id.* at 319. The Court Commissioner of the Washington Supreme Court echoed the Court of Appeals. The Commissioner wrote, "The prosecutor never suggested Mr. Sarausad could be found guilty if he had no knowledge that a shooting was to occur."

The statements of both the Court of Appeals and the Court Commissioner are plainly incorrect. As shown above, the record reveals that the prosecutor repeatedly made precisely the argument that the Court of Appeals and the Court Commissioner stated she did not make.

[18] Taken together, these reasons lead us to conclude that there is a "reasonable likelihood" that the jury misapplied the ambiguous jury instructions, thereby relieving the State of its burden of proof of an element of the crimes with which Sarausad was charged. In so concluding, we consider neither Sarausad's counsel's declaration nor the two jurors' declarations supporting Sarausad's post-verdict motions for a new trial. The magistrate judge did consider the two jurors' declarations, but the district court, citing Federal Rule of Evidence 606(b), held that the magistrate judge erred in considering them. We agree with the district court that the declarations should not have been considered by the magistrate judge. *See* Fed. R. Evid. 606(b); *Tanner v. United States*, 483 U.S. 107, 120-27 (1987); *United States v. Rutherford*, 371 F.3d 634, 639-40 (9th Cir. 2004).

### c. Harmless Error

[19] For the same reasons that we conclude that the second step of *Estelle* is satisfied, we conclude that the constitutional error was not harmless. The parties agree that the test applicable to this case is "whether the error had substantial and injurious effect or influence in determining the jury's verdict." *California v. Roy*, 519 U.S. 2, 5 (1996) (per curiam) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)) (internal quotation marks omitted). The error is not harmless if we are "in grave doubt as to the harmlessness of [the] error." *Roy*, 519 U.S. at 5 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995)) (internal quotation marks omitted). Sarausad's counsel stated during closing argument to the jury, "There is no question that Cesar Sarausad assisted Brian Ronquillo. That's beyond dispute. [H]e drove him to the scene. The ques-

tion is whether Cesar had knowledge that his assistance would promote or facilitate the crime[.]" Because the only disputed issue was whether Sarausad knew that Ronquillo intended to commit murder, relieving the State of its burden of proof on that issue was not harmless error.

### C.   Sarausad's Remaining Claims

Given our holding on Sarausad's *Winship*/*Sandstrom/ Estelle* claim, we do not need to reach his remaining claims.

### Conclusion

**[20]** We affirm the district court with respect to Sarausad's *Winship*/*Sandstrom/Estelle* claim. We remand to the district court to grant the writ and to order Sarausad's release unless the State elects to retry him within a reasonable time.

AFFIRMED and REMANDED.

**Volume 2 of 2**

REINHARDT, Circuit Judge, concurring in part and dissenting in part:

I

I concur in the majority holding that the ambiguous jury instruction on accomplice liability, when viewed in the context of the entire trial, unconstitutionally relieved the State of its burden of proof. I therefore join the decision to affirm the district court's grant of habeas relief on that ground.

I dissent, however, from the majority's conclusion that the incredibly "thin" evidence the State presented at trial, maj. op. at 2591, was sufficient to support Sarausad's convictions under *Jackson v. Virginia*, 443 U.S. 307 (1979), and AEDPA. In fact, the evidence isn't thin. It's non-existent. The state court relied heavily on its determination that Sarausad heard a conversation about a plan to shoot the victim. Yet, there is absolutely *no* evidence in the record that he did. The majority itself points out that there was "no direct evidence" and "limited circumstantial evidence" of Sarausad's guilt. Maj. op. at 2591. Unlike the majority, I would take the next step — a step compelled by its own description of the evidence. I would hold, with the district court, that the evidence against Sarausad was insufficient, would, like the district court, grant relief on his *Jackson* claim, and, finally, would hold that the Double Jeopardy Clause bars the State from retrying him.

My disagreement with the majority on the *Jackson* issue relates both to its analysis and to its result. I strongly disagree with my colleagues' assertion that "[w]e . . . evaluate a state court's resolution of a *Jackson* sufficiency-of-the-evidence claim *in all cases* under § 2254(d)(1) rather than § 2254(d)(2)." Maj. op. at 2562 (emphasis added). As I will explain, I see nothing in law or logic preventing us from evaluating *Jackson* claims under § 2254(d)(2), which authorizes us to grant habeas relief when the state court decision we are reviewing is "based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). In fact, in this case, and in others in which the question is whether the state court has correctly addressed the evidence in the record, we cannot properly analyze the state court decision without reviewing it under that provision. I do not think that any particular type of habeas claim, including a *Jackson* claim, must *in all cases* be considered under only (d)(1) or (d)(2). *See Weston v. Dormire*, 272 F.3d 1109, 1112 (8th Cir. 2001) (analyzing a *Jackson* challenge under both (d)(1) and (d)(2)). Based on the nature of the specific arguments Sarausad makes in this case, I believe that we are compelled to review his *Jackson* claim under § 2254(d)(2), as the district court did; I would therefore issue the writ on that ground. Having done so, I would correct the only error the able district judge made by holding in addition that, under the Double Jeopardy Clause, Sarausad may not be tried again. *See Burks v. United States*, 437 U.S. 1, 12-18 (1978).

## II

The majority states that "§ 2254(d)(2) is not readily applicable to *Jackson* cases." Maj. op. at 2561. This is because, in the majority's view, "[a] court under *Jackson* makes no 'determination of the facts' " in the way that § 2254(d)(2) contemplates. Maj. op. at 2561. This characterization of the judicial decisionmaking process in *Jackson* cases is mistaken. Without question, the state court makes factual determinations in the course of reviewing a conviction under *Jackson*. As with any legal claim, the court must first determine what the facts are and then decide whether those facts support the legal basis for relief asserted by the defendant. To be sure, the ultimate question in a *Jackson* case — whether the evidence is sufficient to support the verdict — is a legal one. *See Schlup v. Delo*, 513 U.S. 298, 330 (1995). This observation, however, does not imply that the state court makes no "determination of the facts" on the way to rendering its legal decision. The state court must, after viewing the material in the record in the

light most favorable to the prosecution, decide what the "evidence" is before it can assess whether a rational factfinder could find the defendant guilty. It does so by reviewing the record and determining the relevant facts, often by drawing the inferences it concludes are appropriate. An unreasonable determination of what the evidence is — how it is properly to be characterized — may, as here, lead the state court to err in answering the ultimate legal question of sufficiency. It is therefore that determination — what the "evidence" is — that a federal habeas court may review, even if deferentially, under § 2254(d)(2). Viewing the evidence favorably to the prosecution does not, as the majority suggests, somehow relieve the state court of its obligation to make the determination of what the "evidence" is: it simply describes the way in which the court goes about performing that task.

It is true that in adjudicating a *Jackson* claim a state court need not actually determine factual conflicts in the record, or, put another way, that it must deem evidentiary conflicts to be resolved in favor of the state. *See Wright v. West*, 505 U.S. 277, 296-97 (1992) (plurality opinion). A state court may not, however, do what the state court did here: it may not, when determining whether to uphold a conviction, rely on "evidence" that does not appear in, or is contrary to, the record. If, for example, one witness testifies that the defendant pulled the trigger, while another witness testifies that he did not, the state court may credit only the first witness's testimony in determining whether the evidence is sufficient. It may *not*, however, determine that a witness testified that the defendant pulled the trigger — and that this testimony provides the basis for upholding a guilty verdict — if *no* witness actually so testified. To do so would not be to view the evidence in the light most favorable to the prosecution, but actually to misstate what the evidence is. When a state court commits such an egregious error, a federal court on habeas review need not, indeed may not, ignore it. If the state court's error in determining the facts was both critical and objectively unreasonable, habeas relief may be granted on a *Jackson* claim, just as

it may in a case raising any other type of constitutional claim. *See, e.g.*, *Kesser v. Cambra*, 465 F.3d 351, 353 (9th Cir. 2006) (en banc) (granting habeas relief on a *Batson* claim because the state court decision resulted from an unreasonable determination of the facts). Determining that nonexistent facts exist (and then relying on them) of course involves an "unreasonable determination of the facts," not an unreasonable application of the law, and thus is properly addressed under § 2254(d)(2), not (d)(1).[1]

---

[1]The majority is completely mistaken in asserting that *Juan H. v. Allen III*, 408 F.3d 1262 (9th Cir. 2005) (as amended), *cert. denied*, 126 S. Ct. 1142 (2006), and 126 S. Ct. 1145 (2006), previously decided that we may analyze *Jackson* claims only under § 2254(d)(1) and never under (d)(2). The open question that *Juan H.* resolved was not whether we should apply (d)(1) instead of (d)(2), but whether AEDPA affected our review of *Jackson* claims at all — whether the extra layer of deference it requires is afforded in insufficiency of the evidence cases.

In *Bruce v. Terhune*, 376 F.3d 950 (9th Cir. 2004), one of the cases we cited in *Juan H.* as leaving the question open, we noted that "[t]he question whether AEDPA requires an additional degree of deference to state court resolution of sufficiency of the evidence claims is unsettled in our circuit." *Id.* at 957. In *Bruce* we cited two post-AEDPA decisions that had reviewed *Jackson* claims without applying any extra deference as well as one decision that had noted in dicta that additional deference was appropriate. *See id.* (citing cases). This was the conflict that *Juan H.* resolved. Neither *Bruce* nor *Juan H.* even remotely suggests that a review of a *Jackson* claim under (d)(2) would be inappropriate. Nor does any of the four out-of-circuit cases that *Juan H.* cites, and on which the majority now relies, in any way suggest as much.

There is, of course, no suggestion in *Juan H.* that the petitioner argued that the state court had determined any material facts unreasonably. *Juan H.* merely holds that we cannot review *Jackson* claims under AEDPA by conducting, as some of our prior decisions had, a straight application of *Jackson*. Although *Juan H.* tells us that under AEDPA, extra deference is required, *Juan H.* takes no position on whether, in a case presenting (d)(2) arguments, that deference may be paid under (d)(2) instead of (d)(1). Indeed, although the petitioner in *Juan H.* did not argue that his conviction stemmed from unreasonable factual determinations, we expressly noted in that case that "under § 2254(d)(2), a federal court may also grant a writ of habeas corpus if a material factual finding of the state court reflects 'an

If the state court's factual determinations are not objectively unreasonable, however, or if the petitioner does not challenge them, we may not ignore what the state court found the facts to be and analyze the record for ourselves.[2] We must, for purposes of § 2254, accept its findings as correct. *See Taylor*, 366 F.3d at 1000 ("Once the state court fact-finding process survives [review for unreasonableness under § 2254(d)(2)] — or in those cases where petitioner does not raise [such a] challenge to the facts as found by the state court — the state court's findings are dressed in a presumption of correctness . . . ."). We may then proceed under § 2254(d)(1) to determine whether the state court unreasonably applied *Jackson* in concluding that the evidence — as that court found it — was sufficient to support the verdict.[3]

*Jackson* challenges in general are permissible under both (d)(1) and (d)(2), but these two types of challenges are different in kind. Assuming that the case does not involve new evidence presented for the first time in federal court, a petitioner bringing a *Jackson* challenge under (d)(1) argues that, *accepting the state court's factual determinations as correct* — that is, accepting the state court's characterization of what the evidence is — the state court applied *Jackson* in an "unreason-

---

unreasonable determination of the facts in light of the evidence presented in the state court proceeding.' " *Juan H.*, 408 F.3d at 1270 n.8 (quoting § 2254(d)(2)). We did not suggest that the principle we had just announced — which follows directly from the statutory text — is inapplicable to *Jackson* claims, one of the very claims we were considering in *Juan H*.

[2] If "the state court should have made a finding of fact but neglected to do so," we may make the finding ourselves. In such a case, the state court's error is treated as an unreasonable determination of the facts under § 2254(d)(2). *See Taylor v. Maddox*, 366 F.3d 992, 1000-01, 1008 (9th Cir. 2004).

[3] In such cases, we must presume that the state court's factual determinations are correct. They may be rebutted, however, in what we term an "extrinsic" challenge, by clear and convincing evidence presented for the first time in federal court. *See* § 2254(e)(1); *Taylor*, 366 F.3d at 1000.

able" manner in concluding that such evidence was sufficient to show the defendant's guilt beyond a reasonable doubt. *See, e.g.*, *Torres v. Mullin*, 317 F.3d 1145, 1151 (10th Cir. 2003) (noting intracircuit split regarding treatment of *Jackson* cases under AEDPA; analyzing *Jackson* claim under (d)(1) because "*[i]n this instance*," the petitioner "does not contend that the [state court's] factual findings are erroneous" but only that "the court's ultimate conclusion — that the evidence is sufficient to support his . . . convictions — constitutes an unreasonable application of *Jackson*" (emphasis added)). A challenge under (d)(2), by contrast, asserts that, on the basis of the trial record, the state court's factual determinations — its characterizations of the evidence — are "unreasonable" (not just wrong) and must be set aside, *see Taylor*, 366 F.3d at 1008, and that on the basis of the facts as properly determined, the evidence is insufficient under *Jackson* to convict. Of course, in some cases a petitioner may argue that the state court both applied the law and determined the facts in an unreasonable manner, bringing challenges under both § 2254(d)(1) and (d)(2), and in such cases both provisions will be implicated.

In actuality, in reviewing Sarausad's *Jackson* claim, the majority employs § 2254(d)(2) although it denies doing so at every step. The majority spends five pages criticizing the state court's most important factual determination — that the shooting was discussed in Sarausad's car during the return trip to the school — concludes that the determination was "objectively unreasonable," and sets the determination aside. Maj. op. at 2565-67. Without doubt, such actions may be undertaken only under § 2254(d)(2), not (d)(1). *See Taylor*, 366 F.3d at 1008. In other words, after asserting that "§ 2254(d)(2) is not readily applicable to *Jackson* cases," maj. op. at 2561, the majority readily applies it.[4] Why the majority

---

[4]The majority's decision to set aside an objectively unreasonable state court factual determination also belies its unfounded assertion that state courts adjudicating *Jackson* claims make no factual determinations (or at least no factual determinations of the type cognizable under § 2254(d)(2)) to begin with.

insists on asserting that § 2254(d)(2) is out of reach for *Jack-son* claims, then uses that very provision *sub silentio* for the limited purpose of setting aside a particular factual determination, while continuing to maintain that the provision may not serve as the statutory basis for habeas relief, simply escapes me. The reason for the majority's assertion is particularly difficult to understand as AEDPA itself creates no hierarchy between (d)(1) and (d)(2), and as (d)(2) has served as the sole basis for habeas relief in other decisions of this court. In short, the majority actually holds that "a material factual finding of the state court" is objectively unreasonable"; it may then "grant a writ of habeas corpus" under § 2254(d)(2). *See Juan H.*, 408 F.3d 1270 n.8. For reasons I am unable to grasp, however, the majority refuses to do so on the basis of an imagined categorical bar against issuing the writ under that section in cases involving *Jackson* claims.

### III

Sarausad's *Jackson* challenge belongs under § 2254(d)(2). While legal questions are ultimately involved, the core issue in Sarausad's claim concerns the state court's adoption of facts purportedly from, and characterization of facts purportedly in, the record. Sarausad's habeas argument centers on a number of factual matters as to which he contends the state court reached an objectively unreasonable determination, although one such wholly unwarranted and unreasonable factual determination is clearly dispositive of the outcome.

The magistrate judge, in findings the district court adopted, correctly understood that Sarausad was asserting a *Jackson* challenge under § 2254(d)(2), explicitly finding that Sarausad had satisfied that provision. She wrote, unequivocally, that "[t]he [state] appeals court's conclusion that the cited evidence amounted to circumstantial evidence from which the jury could infer that petitioner knew of the gun was based on an unreasonable determination of the facts, in light of the testimony. 28 U.S.C. § 2254(d)(2)." Later in her report, the mag-

istrate judge reiterated that "the court's presumption that the jurors [found that Sarausad knew that one of his passengers had a gun] was based on 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' 28 U.S.C. § 2254(d)." On appeal, the section of Sarausad's opening brief that addresses the AEDPA standard argues that "[t]he Washington court's analysis depends on a patchwork of multi-tiered and strained inferences." The brief makes a number of arguments that the state court misapprehended the record or drew factual conclusions that were unsupported by sufficient evidence. These are (d)(2) arguments. *See Taylor*, 366 F.3d at 999, 1001.

It is our duty, then, in my opinion, to decide whether Sarausad's claim under § 2254(d)(2) has merit. The magistrate judge's extensive analysis of the evidence, as well as an independent review of the record, leads to the inevitable conclusion that the state court's factual determinations, which formed the basis for its rejection of Sarausad's *Jackson* claim, were objectively unreasonable, and that no justification for reversing the district court's decision exists. Indeed, after analyzing under (d)(2) each of the factual determinations on which the state court based its legal conclusion, and after perusing the record independently, I believe that there is virtually no "evidence," direct or circumstantial, as to Sarausad's purported knowledge that is not a product of the state court's unreasonable determination of the facts.

In *Taylor v. Maddox*, we interpreted § 2254(d)(2), which, we explained, covers claims in which a petitioner "challenges the state court's findings based entirely on the state record." 366 F.3d at 999. We deemed such claims "intrinsic" challenges, and contrasted them with "extrinsic" attacks in which a petitioner seeks to overturn state court factfinding on the basis of evidence presented for the first time in federal court. *Id.* at 1000. Specifically, we wrote that state court findings may be unreasonable under § 2254(d)(2) where, *inter alia*, "the state courts plainly misapprehend or misstate the record

in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim." *Id.* at 1001. "Such a challenge may [also] be based on the claim that the finding" — not to be confused with the verdict itself — "is unsupported by sufficient evidence." *Id.* at 999.[5] Finally, "[w]hen we determine that state-court fact-finding is unreasonable," we continued, "we have an obligation to set those findings aside and, if necessary, to make new findings." *Id.* at 1008. In performing our (d)(2) review, we of course give substantial deference to the state court findings. In *Taylor*, we applied the requisite deference and issued the writ under § 2254(d)(2), as the magistrate judge implicitly did here. The *Taylor* analysis fits the facts and circumstances of this case to a "t."

The state court's key factual determinations in this case cannot withstand the deferential "intrinsic" review prescribed in *Taylor*. In its most important finding, the state court concluded that "Gosho and Marckx testified that 'capping' was discussed on the return trip to the school."[6] *Sarausad v. Washington*, 39 P.3d 308, 319 (Wash. Ct. App. 2001). This fact, if true, would lend strong support to the State's argument that Sarausad knowingly facilitated the shooting — it clearly "goes to a material factual issue that is central to petitioner's claim." *Taylor*, 366 F.3d at 1001. Without this finding, there is unquestionably insufficient evidence under *Jackson* of the only disputed element of the case — whether Sarausad knew of the intended criminal act. As the magistrate judge demon-

---

[5]Although § 2254(e)(1) accords state court factual determinations a "presumption of correctness" rebuttable only by "clear and convincing evidence" (introduced at the federal habeas proceeding), these commands "do not apply to a challenge that is governed by the deference implicit in the 'unreasonable determination' standard of *section 2254(d)(2)*." *Id.* at 1000. That is, § 2254(e)(1) does not apply to challenges brought under § 2254(d)(2).

[6]"Capping" is shooting. Thus the purported testimony was that the subject of shooting was discussed in Sarausad's car when Sarausad and the others were in the vehicle on the way to the site of the offense.

strated, even under the deferential standard prescribed in *Taylor*, the state court's "capping" determination was objectively unreasonable under § 2254(d)(2), and must be set aside. Indeed, as the majority concludes, maj. op. at 2565, 2567, neither Gosho nor Marckx actually testified, as the state court found each did, that "capping" was "discussed" in Sarausad's car. I agree with the majority that the state court's determination to the contrary — that is, its determination that two witnesses testified to damning facts to which they did not in actuality testify — is, therefore, obviously unreasonable and must be set aside. *See* maj. op. at 2569-70. I would do so, however, under § 2254(d)(2), not (d)(1).

In another factual determination — this time one on which the majority does rely, maj. op. at 2572 — the state court found that Ronquillo, the shooter, "tied a bandana over the lower part of his face." *Sarausad*, 39 P.3d at 319. The State seizes upon this finding to argue that, because it takes more than a moment to tie a bandana, the occupants of Sarausad's car, including Sarausad (who was driving), had warning that a shooting was going to occur. Yet all of the car's occupants testified that they did not see Ronquillo put on the bandana. Instead, the record contains several references to "pulling the bandana on," and the magistrate judge, after carefully reviewing the record, characterized the action that way. As the magistrate judge concluded, the record contains no support for the assertion that Sarausad saw Ronquillo don the bandana. The difference between "tying" a bandana around one's head and simply "pulling" up a pre-tied bandana may seem slight, but it is enormously important in the context of this case. Without the state court's wholly unsupported — and thus objectively unreasonable, *see Taylor*, 366 F.3d at 999 — determination that Ronquillo tied the bandana on in a way that Sarausad would have seen, the State's case, which already lacks sufficient evidence in the absence of the erroneous "capping" determination, falls even farther short of meeting the *Jackson* standard. All this, of course, is without even considering that the inference that the state court drew as to guilt from the

wearing or purported tying on of a bandana is, as the magistrate judge found, wholly speculative. *See United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir. 1986) ("[M]ere suspicion or speculation cannot be the basis for creation of logical inferences.").

The state court also found that "Sarausad . . . drove the car in such a manner as to facilitate a drive-by shooting, not in such a manner as to stop, park the vehicle and engage in fisticuffs." *Sarausad*, 39 P.3d at 319. This finding, on which the majority relies, maj. op. at 2571, also goes to a material factual issue. The magistrate judge ruled this finding unreasonable because it was "an incorrect characterization of the complete testimony." The only evidence lending support to the state court's finding is the testimony of one witness, James Cooke, who described Sarausad's driving as "swooping." Yet Cooke admits that in his initial statement to the police he did not describe the driving as "swooping." In addition, Cooke stated that he was directly behind Sarausad's car, but every other witness testified that Vicencio's car was behind Sarausad's. Cooke also stated that when Sarausad sped off, there was no other car following. Again, every other witness testified to the contrary. Multiple witnesses described the path of Sarausad's car in a manner that was consistent with stopping to get out. Furthermore, as the State conceded at oral argument before this court, even if Sarausad did "swoop," such driving was just as consistent with a planned fistfight as it was with a drive-by shooting. *See United States v. Bautista-Avila*, 6 F.3d 1360, 1363 (9th Cir. 1993).

The same is true, as the magistrate judge found, of Sarausad's "Are you ready?" comment. It is nothing but speculation to conclude that in uttering this question Sarausad meant "Are you ready to shoot someone?" rather than "Are you ready to fight?" Indeed, as the magistrate judge pointed out, the only witness who testified that Sarausad asked "Are you ready?"

also testified that the Diablos had discussed returning to the school only for a fight, not for a shooting.[7]

Without the "evidence" described above, and especially without the objectively unreasonable determination, wholly unsupported by the record, that a discussion of capping occurred in Sarausad's vehicle, there is almost nothing to suggest that Sarausad had the slightest indication or reason to believe that a shooting might take place. In its effort to reverse the district court, however, the majority seizes upon tiny shreds of "evidence" that even the state court itself deemed entirely unworthy of comment. In addition to lending little support to the case against Sarausad, many of these bits of evidence are unsupported by the record; one is even contradicted by the majority's own opinion.

For example, the majority suggests that Sarausad was present for a conversation in which Gosho discussed the possibility of a shooting, maj. op. at 2570, and that this provides a basis for the jury's verdict. As noted above, the majority itself set aside the state court's finding that the shooting was discussed *during the return trip to the school*. Now the majority suggests that Gosho discussed the shooting at the house, *before* the return trip, while "everybody" was present. Maj. op. at 2570. But the majority elsewhere points out that "if the conversation [about shooting] took place before the return trip to the school, as Gosho testified, there is no direct evidence that Sarausad heard it. Gosho never testified that Sarausad participated in or heard the conversation." Maj. op. at 2565. Furthermore, as the majority itself also reports, even if the conversation did occur within Sarausad's earshot, nobody, not even Gosho, took it seriously. Maj. op. at 2567.

---

[7]The majority recounts Sarausad's "Follow me" comment as though it were an additional piece of evidence separate from the "Are you ready?" comment. The record is clear, however, that only one statement was uttered. One witness testified that the statement was "Are you ready?" while others testified that it was "Follow me" or "Follow us."

As another example, the majority's opinion relies on the testimony of witnesses who claimed to have seen "a gun in the hands of a Diablo" during the first trip to the school. Maj. op. at 2570. However, as the magistrate judge concluded after a careful analysis of the record, "there was *no evidence* whatsoever that ties [the testimony] to whether [Sarausad] saw or knew of the alleged gun." The district court's factual finding is hardly clearly erroneous.

The majority's efforts to save the state court's decision from its unreasonable factual determinations by combing the record for inconsequential shreds of evidence that do not actually support an inference of guilt should not survive under § 2254(d)(2). Our review under (d)(2) is deferential, but "deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

IV

A final question is whether a petitioner who has satisfied § 2254(d)(2) must also show that the state court's application of law was "objectively unreasonable" under § 2254(d)(1), or instead may simply show that it constituted an error of constitutional magnitude. In the *Jackson* context, the question is whether a petitioner who demonstrates that the state court's material factual determinations were objectively unreasonable must then show that, if the state court were to reject his *Jackson* claim on the basis of the corrected facts, such rejection would constitute an objectively unreasonable application of *Jackson* under § 2254(d)(1). The answer must be "No." Section 2254(d) is written in the disjunctive: to obtain federal habeas relief, a petitioner must show, in addition to a substantive federal constitutional violation, *see* § 2254(a), either that the state court decision was contrary to or an unreasonable application of clearly established Supreme Court law *OR* that it was based on an unreasonable determination of facts. *See* § 2254(d). By AEDPA's own unambiguous terms, a petitioner need not satisfy both §§ 2254(d)(1) and (d)(2). *See Davis v.*

*Grigas*, 443 F.3d 1155, 1158-59 (9th Cir. 2006) (remanding to determine whether petitioner was entitled to relief under § 2254(d)(2) after expressly holding that he was not entitled to relief under § 2254(d)(1)). Both this court and the Supreme Court have granted habeas relief under § 2254(d)(2) without even mentioning (d)(1) or suggesting that its strictures must also be satisfied. *See, e.g.*, *Miller-El v. Dretke*, 545 U.S. 231 (2005); *Kesser*, 465 F.3d at 353; *see also Kesser*, 465 F.3d at 371-72 (Wardlaw, Circuit Judge, concurring) (joining the majority's opinion granting relief under § 2254(d)(2) and recommending relief "on the alternative ground" of § 2254(d)(1)).

The text and structure of AEDPA compel the conclusion that, where the state court decision rejecting a habeas petitioner's constitutional claim resulted from an unreasonable determination of the facts, the petitioner is entitled to relief if, under the corrected version of the facts, a constitutional violation would be established. The deference due state courts under AEDPA has already been given and is overcome at the time the factual determination is set aside. There is no need for a further exercise of deference, or, as it might be put, for double deference. *See, e.g.*, *Rolan v. Vaughn*, 445 F.3d 671, 683 (1st Cir. 2006) (affirming habeas relief for petitioner who satisfied § 2254(d)(2) and under the correct facts established a *Strickland* violation); *id.* ("Because we conclude that the [state court's] findings of fact . . . were unreasonable and that, when looked at under the *Strickland* standard, [petitioner's] attorney's failure to investigate . . . fell below an objective standard of reasonableness, and that there is a reasonable probability that but for that failure the result would have been different, we will affirm the grant of the writ of habeas corpus by the District Court.").

Specifically, in the context of sufficiency of the evidence, after making a successful § 2254(d)(2) argument, a petitioner need not also show that if the state court had applied *Jackson* to the proper facts and reached the same result, its adverse

decision would have been objectively unreasonable. A straight application of *Jackson* is all that is necessary once the requirements of (d)(2), and thus AEDPA, are satisfied. In *Juan H. v. Allen III*, we held that "after AEDPA, we apply the standard of *Jackson* with an additional layer of deference." 408 F.3d at 1274. But *Juan H.* is a (d)(1) case. It does not speak to how we apply *Jackson* after we have already satisfied the provisions of AEDPA under (d)(2) and have already given the state court's decision its proper level of deference. *Juan H.*, as well as (d)(1), is simply inapposite to a (d)(2) challenge or, to put it differently, the "additional layer of deference" required by AEDPA has already been given. No super-deference is required by that statute.

When a state court denies relief under *Jackson* on the basis of an unreasonably determined set of erroneous facts, and we set aside those factual findings under (d)(2) after giving them the requisite deference, and we then substitute either our own factual determinations or accept the district court's, there is simply no state court decision that has considered the proper facts to which we can defer. *Cf. Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (applying de novo review under AEDPA to an issue that the state court "never reached"). No state court has decided whether the facts, as properly determined, satisfy the *Jackson* standard. AEDPA is about deferring to state courts, not about blindly raising the bar for habeas petitioners seeking to establish constitutional violations; were we to "defer" to a state court decision that does not exist, we would be doing just that.[8]

---

[8]Even if we did conclude, contrary to statutory text and structure, that a petitioner who satisfies § 2254(d)(2) must subsequently satisfy § 2254(d)(1) in order to obtain relief, I would still issue the writ on Sarausad's *Jackson* claim. A state court decision upholding Sarausad's conviction on the basis of the evidence that remains after the unreasonable factual determinations are set aside would constitute an objectively unreasonable application of *Jackson*.

## V

The State presented insufficient evidence in this case to allow a rational factfinder to find Sarausad guilty of second-degree murder and attempt beyond a reasonable doubt. The contrary decision of the Washington Court of Appeals was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). Accordingly, we are required to grant relief on Sarausad's *Jackson* claim under § 2254(d)(2). I would do so without hesitation. I cannot join an opinion that characterizes the State's evidence as "thin" — as consisting of "no direct evidence" and "limited circumstantial evidence" — that describes in detail the state court's severe distortions and misstatements of the little potentially significant evidence that there is, and that then, relying on shreds of gossamer that the state court deemed unworthy even of mention, holds the evidence to be sufficient to bar habeas relief and thus permits Sarausad's retrial in violation of the Double Jeopardy Clause. *See Burks*, 437 U.S. at 12-18. I dissent from the majority's holding on the *Jackson* claim.

BYBEE, Circuit Judge, dissenting:

This case comes to us through an unusual set of proceedings. After Washington courts denied direct review of Sarausad's appeal from his conviction, the Washington Supreme Court issued a "clarifying instruction" in *State v. Roberts*, 142 Wash. 2d 471, 14 P.3d 713 (2000), which was relevant to Sarausad's appeal. *Sarausad v. State*, 109 Wash. App. 824, 829, 39 P.3d 308, 311 (2001). In Sarausad's second appeal, brought through a personal restraint petition, the Washington Court of Appeals "reexamine[d] the record in light of *Roberts*," and confessed that in its prior opinion it "erred." *Id.* at 830, 837, 39 P.3d at 312, 315. On reconsideration, in a lengthy opinion, the Washington Court of Appeals held that

the jury instructions given in Sarausad's case "complied with *Roberts* and the Washington accomplice liability statute." *Id.* at 838, 39 P.3d at 316. The Washington Supreme Court, adopting a Commissioner's ruling citing *Roberts*, found that "the trial court correctly instructed the jury" on accomplice liability.

Notwithstanding the care with which the Washington courts reconsidered Sarausad's claims in light of this clarification in Washington law, the majority finds that Washington courts should not have been trusted with their own jury instructions. Relying on hornbook platitudes from *Estelle v. McGuire*, 502 U.S. 62 (1991), and *In re Winship*, 397 U.S. 358 (1970), the majority holds that the jury instruction at issue here was not only "ambiguous," Maj. Op. at 2590, and thus " 'reliev[ed] the State of the burden of proof enunciated in *Winship*,' " *id.* at 2573 (quoting *Sandstrom v. Montana*, 442 U.S. 510, 521 (1979)), but that there was a "reasonable likelihood" that the jury applied the instructions in an unconstitutional manner, *id.* at 2593. In so concluding, the majority implicitly finds that the jury instruction at issue "by itself so infected the entire trial that the resulting conviction violates due process," *Estelle*, 502 U.S. at 72, that we must override the findings of Washington courts to the contrary.

With all due respect to my colleagues in the majority, the judgment of the Washington courts bears no resemblance to the majority's description. The jury instructions at issue here were in all material respects identical to the Washington statute on accomplice liability and to a jury instruction specifically approved by the Washington Supreme Court in *Roberts*. Neither the statute nor the instruction is ambiguous. Moreover, the law the majority finds "clearly established" in *Estelle* and *Winship* could not have put the Washington courts on notice that their jury instructions were "ambiguous." They could not have known that the instructions were an "objectively unreasonable" violation of the Due Process Clause. *Williams v. Taylor*, 529 U.S. 362, 409-11 (2000); *see also* 28

U.S.C. § 2254(d)(1). Lastly, there was not a "reasonable likelihood" of misapplication by the jury. I respectfully dissent in the majority's conclusion to the contrary.[1]

## I

The instructions given at Sarausad's trial and at issue here are identical in all material respects to the Washington accomplice liability statute. Instructions 45 and 46, as given in this case, provided that:

> [No. 45] You are instructed that a person is guilty of a crime if it is committed by the conduct of another person for which he is legally accountable.
>
> A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of the crime.
>
> [No. 46] A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either (1) solicits, commands, encourages, or requests another person to commit the crime or (2) aids or agrees to aid another person in planning or committing the crime.
>
> The word "aid" means all assistance whether given by words, acts, encouragement, support or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime.

---

[1] I concur in the majority's characterization of our task under AEDPA in reviewing a state court's decision applying *Jackson v. Virginia*, 443 U.S. 307 (1979). I agree with the majority that our review of a state court's *Jackson* review occurs under 28 U.S.C. § 2254(d)(1), and not 28 U.S.C. § 2254(d)(2), *see* Maj. Op. at 2562, although I take issue with the majority's particular application of § 2254(d)(1).

> However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

*Sarausad*, 109 Wash. App. at 838 n.8, 39 P.3d at 316 n.8. Instruction 45 is, word for word, taken from subsections (1) and (2) of the Washington accomplice liability statute under which Sarausad was charged. Wash. Rev. Code § 9A.08.020.[2] Instruction 46 is, with a modification that is not relevant here, identical to subsection (3) of the Washington statute:

> (3)   A person is an accomplice of another person in the commission of a crime if:
>
>> (a)   With knowledge that it will promote or facilitate the commission of the crime, he
>>
>>> (i)   solicits, commands, encourages, or requests such other person to commit it; or
>>>
>>> (ii)   aids or agrees to aid such other person in planning or committing it; . . .
>>
>> . . . .[3]

---

[2]Wash. Rev. Code § 9A.08.020 (1)-(2) provides, in pertinent part:

(1)   A person is guilty of a crime if it is committed by the conduct of another person for which he is legally accountable.

(2)   A person is legally accountable for the conduct of another person when:

. . . .

(c)   He is an accomplice of such other person in the commission of the crime.

[3]For convenience, I have *italicized* the words in instruction 46 that were added to § 9A.08.020(3), and I have [bracketed] the words that appear in § 9A.08.020(3) but were omitted in the instruction:

Moreover, these instructions were not written for Sarausad's trial, but have been used in Washington for many years.[4] Instruction 46, for example, is nearly identical to instruction 8 given in *State v. Davis*, 101 Wash. 2d 654, 656, 682 P.2d 883, 884-85 (1984). This instruction was expressly approved in *State v. Roberts*: "the jury instruction in *Davis*, unlike the jury instruction here, copied exactly the language from the accomplice liability statute: it allowed for a conviction as an accomplice if the accomplice acted 'with knowledge that it will promote or facilitate the commission of *the crime* . . . .' " *Roberts*, 142 Wash. 2d at 511-12, 14 P.3d at 736 (quoting *Davis*, 101 Wash. 2d at 656, 682 P.2d at 884).[5]

As a statement of Washington law, instructions 45 and 46 could not have been clearer. As we recently wrote in *United States v. Lyons*:

> The difficulty with [defendants'] challenge is that the court's instruction was a nearly verbatim quota-

---

A person is an accomplice [of another person] in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he *or she either* (1) solicits, commands, encourages, or requests [such other] *another* person to commit [it] *the crime* [;] or (2) aids or agrees to aid [such other] *another* person in planning or committing [it] *the crime*.

[4]Section 9A.08.020 was taken from the *Model Penal Code* 2.06 (1985). *See Roberts*, 142 Wash. 2d at 510, 14 P.3d at 735.

[5]The majority incorrectly states that "[a]t the time of the trial, it was widely thought that Washington law did not require the accomplice to know what particular crime the principal intended to commit." Maj. Op. at 2574. In *In re Domingo*, the Washington Supreme Court expressly clarified that *State v. Cronin*, 142 Wash 2d. 568, 14 P.3d 752 (2000), and *Roberts*, 142 Wash. 2d 471, 14 P.3d 713 (2000), did not effect a substantial change in accomplice liability law, because *Davis*, 101 Wash. 2d 654, 682 P.2d 883 (1984), and *State v. Rice*, 102 Wash. 2d 120, 683 P.2d 199 (1984), established that an accomplice must have general knowledge of the specific crime committed by the principal. *See* 115 Wash. 2d 356, 362-66, 119 P.3d 816, 819-21 (2005).

tion from *Madigan [v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 624 (2003)]. It is difficult to understand the claim that the jury instruction was "flatly prohibited by the Supreme Court in *Madigan*" when the instruction quite appropriately quoted the controlling law.

453 F.3d 1222, 1233 (9th Cir. 2006) (citation omitted), *amended by* 472 F.3d 1055 (9th Cir. 2007). As in *Lyons*, the only thing "difficult to understand" in this case is how the majority finds that an instruction that "quite appropriately quoted the controlling law" is ambiguous.

## II

Tracing the history of Washington state courts on the issue reveals that the instructions in this case avoid past infirmities and reflect the endorsed approach. The instructions here completely satisfy the Washington Supreme Court's concerns in *Roberts*. Roberts argued that the instruction on accomplice liability given at his trial permitted the jury to convict him if he had general knowledge that his accomplice might commit *any* crime and not just *the* crime charged. *See Roberts*, 142 Wash. 2d at 509, 14 P.3d at 734-35. The instruction given in Roberts's case was materially different from the instructions given here and in *Davis*. The faulty instruction in *Roberts*, with key words italicized by the Washington Supreme Court, provided:

> You are instructed that a person is guilty of a crime if it is committed by the conduct of another person for which he is legally accountable. A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of *a crime*.

> A person is an accomplice in the commission of a crime, whether present at the time of its commis-

> sion or not, if, with knowledge that it will promote or facilitate *its commission*, he either: (a) solicits, commands, encourages or requests another person to commit the crime; or (b) aids another person in planning or committing the crime . . . .

*Id.* at 510, 14 P.3d at 735. The material distinction between the *Roberts* instruction and the Washington accomplice liability statute was the use of "a crime," as opposed to "the crime" in the first paragraph of the jury instruction. *Id.* (pointing to "the phrase 'a crime' in the first paragraph of instruction 7" and contrasting it with "the phrase 'the crime' in the parallel portion of the statute, RCW 9A.08.020(2)(c)"). According to the court, " 'the crime' means the charged offense." *Id.* Through that language, the legislature "intended the culpability of an accomplice not extend beyond the crimes of which the accomplice actually has 'knowledge.' " *Id.* at 511, 14 P.3d at 735 (referring to WASH. REV. CODE § 9A.08.020). By contrast, the instruction given in Roberts's case "essentially allowed the jury to impose strict liability on Roberts" and "improperly departed from the language of the statute." *Id.* at 511, 14 P.3d at 735-36.

The Washington Supreme Court approved the jury instruction in *Davis* because it was "copied exactly" from the statute itself. *Id.* at 511-12, 14 P.3d at 736. The Court emphasized that *Davis* did "not impose strict liability on accomplices for any and all crimes but merely reaffirm[ed] our longstanding rule that an accomplice need not have specific knowledge of *every element* of the crime committed by the principal, provided he has general knowledge of that specific crime." *Id.* at 512, 14 P.3d at 736.

*Roberts* was followed by *State v. Cronin*, 142 Wash. 2d 568, 14 P.3d 752 (2000). In Cronin's case, the jury was issued the following instruction on accomplice liability:

A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.

A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of a crime, he either: (1) solicits, commands, encourages or requests another person to commit the crime; or (2) aids or agrees to aid another person in committing a crime.

*Id.* at 576-77, 14 P.3d at 756-57. Again, the court invalidated the jury instruction based on the use of the term "a crime." Citing *Roberts*, the court concluded that "the fact that a purported accomplice knows that the principal intends to commit 'a crime' does not necessarily mean that accomplice liability attaches for any and all offenses ultimately committed by the principal." *Id.* at 579, 14 P.3d at 758. Instead, "in order for one to be deemed an accomplice, that individual must have acted with knowledge that he or she was promoting or facilitating *the* crime for which that individual was eventually charged." *Id.* Consequently, the instructions in Cronin's case were found "legally deficient." *Id.* It is not clear which reference to "a crime" was most crucial to the court, however one can surmise that it was likely the third instance, which allows conviction based only on "knowledge that it will promote or facilitate the commission of *a crime*." *Id.* at 576-77, 14 P.3d at 756 (emphasis added). This aspect of the instruction would not require knowledge of the specific crime to be committed, and would fail the rigid standard expressed in *Roberts*.

There is no question that the jury in Sarausad's case was properly instructed. The instruction mimicked the statute itself. The instruction suffered from none of the deficiencies identified in *Roberts* and *Cronin* because the jury was first instructed that it could not convict Sarausad unless it found that Sarausad was "an accomplice of such other person in the commission of *the crime*." *Sarausad*, 109 Wash. App. at 838

n.8, 39 P.3d at 316 n.8 (emphasis added). For that reason, it does not suffer from the infirmity within the *Roberts* instruction. The jury was further instructed that Sarausad was an accomplice if he acted "with knowledge that it will promote or facilitate the commission of *the crime*." *Id.* (emphasis added). Because of the specificity here, the instruction was not invalid like that in *Cronin*. Thus, the judgment of the Washington Court of Appeals that "the [trial] court properly instructed the jury as to the law of accomplice liability" is plainly correct, *id.* at 843, 39 P.3d at 318-19, as is the conclusion of the Washington Supreme Court that "the trial court correctly instructed the jury that it could convict Mr. Sarausad of murder or attempted murder as an accomplice only if it found he knowingly aided in the commission [of] 'the' crime charged."

### III

Notwithstanding the clarity of the Washington courts' rulings in *Roberts*, *Cronin*, and *Sarausad*, the majority sows confusion where none exists. The majority notes that the first issue under *Estelle v. McGuire*, 502 U.S. 62 (1991), is "whether the jury instructions were ambiguous" and concludes that "the jury instructions were, at the very least, ambiguous." Maj. Op. at 2585, 2590. With all due respect, the majority has read neither the instructions nor *Roberts* closely enough.

The majority observes that the instruction found deficient by the Washington Supreme Court in *Roberts* was "*almost* identical" to instruction 45 given at Sarausad's trial. Maj. Op. at 2586 (emphasis added); *see also id.* at 2587 ("The only difference . . . is that the words 'the crime' . . . in Sarausad's case are replaced by the words 'a crime' . . . in *Roberts*."). The trick is the word "almost." The fact is, that in the ways in which it counts in Washington, Sarausad's instructions were *not* identical to the instructions given in *Roberts*. In *Roberts*, the instruction began "A person is legally accountable

for the conduct of another person when he is an accomplice of such other person in the commission of *a crime*." (Emphasis added). By contrast, instruction 45 in Sarausad's trial read "A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of *the crime*." (Emphasis added). Unlike Sarausad's instruction, the *Roberts* instruction did not require knowledge of the commission of the specific crime; rather, it merely (and erroneously) required knowledge of "a crime." The critical difference between the two instructions is that the Sarausad instruction clearly attaches knowledge to the specific crime, whereas the *Roberts* instruction seems to attach knowledge to any crime. Then, the words "its commission" in the *Roberts* instruction compound the problem. In *Roberts*, the instruction provides "A person is an accomplice in the commission of *a crime* . . . if, with *knowledge* that it will promote or facilitate *its* commission . . . ." (Emphasis added). "Its" refers back to "a crime." Had "its" referred back to "the crime," and not "a crime," then the *Roberts* instruction would have correctly stated Washington law. But Sarausad's instruction avoids this problem altogether because it explicitly requires knowledge of the commission of "*the* crime." The majority minimizes the difference between the terms "a crime" in the *Roberts* instruction and "the crime" in Sarausad's instruction, commenting that "th[is] simple change . . . does not . . . make the jury instructions . . . unambiguous." Maj. Op. 2587. However, the distinction is critical in Washington law, and it is widely understood, across *Roberts*, *Cronin*, and *Davis*, that it makes the difference in the accomplice liability instruction. Therefore, in no way does the same "basic problem" remain here as in *Roberts*. *See* Maj. Op. 2587. That's what *Roberts* was all about, and it fully explains the Washington courts' rulings in this case as well.

The contrast between the two instructions becomes even more evident when they are read in context with the preceding instruction in each case. In *Roberts*, the jury was instructed that "a person is guilty of *a crime* if it is committed by the

conduct of another person for which he is legally accountable. A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of *a crime*." *Roberts*, 142 Wash. 2d at 510, 14 P.3d at 735 (first emphasis added). This instruction incorrectly states Washington law because the second reference to "a crime" suggests that *any* crime committed by the principal makes the accomplice strictly liable. In Sarausad's case, however, the jury was instructed that "a person is guilty of *a crime* if it is committed by the conduct of another person for which he is legally accountable. A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of *the crime*." *Sarausad*, 109 Wash. App. at 838 n.8, 39 P.3d at 316 n.8 (emphasis added).

When the instructions given in Sarausad's case are compared with the full instruction 7 in *Roberts*, the majority's claim that the instructions are "almost identical" evaporates entirely. It is this comparison that reveals the crucial ambiguity in the *Roberts* instruction. Because there was no similar ambiguity here, the controlling Supreme Court authority is not *Estelle*, but *Weeks v. Angelone*, 528 U.S. 225 (2000). In that case, the Supreme Court stated clearly that there is no constitutional violation when a "jury was adequately instructed, and . . . the trial judge responded to the jury's question by directing its attention to the precise paragraph of the constitutionally adequate instruction." *Id.* at 234.

The majority attempts to classify Sarausad's instruction as less offensive than the *Roberts* instruction but still impermissibly ambiguous under *Estelle*. The majority admits that the correction from "a crime" to "the crime" means that "Sarausad's case does not invite an erroneous construction to the same degree as the flawed instruction in *Roberts*," but finds that the lack of "an explicit statement that an accomplice must have knowledge of the actual crime the principal intends to commit" makes the instruction nonetheless defective. Maj.

Op. at 2586, 2587. Of course, the majority has no case law to support its proposition that an additional explicit statement is, or has ever been, required by Washington courts. In fact, the Washington Supreme Court's express approval of the *Davis* instruction belies the existence of such a requirement. *See Roberts*, 142 Wash. 2d at 511-12, 14 P.3d at 736. Contrary to the majority's argument, the corrected instruction alone in *Davis*, as here, sufficiently cured the defective language without any further explanation.

Lastly, the majority rests its finding of ambiguity on evidence it deems "most revealing"—that the Washington Court of Appeals initially determined Sarausad's instructions permitted his conviction as an accomplice "even if he did not know that Ronquillo intended to commit murder." Maj. Op. at 2588 (emphasis omitted). However, this early conclusion was later repudiated by the same court. The majority may claim that it is "hard pressed to read the very same statute and instructions as unambiguously instructing the jury to do precisely the opposite" now, Maj. Op. at 2588, but that is exactly what the Washington Court of Appeals' retraction forces us to do. Moreover, ambiguity should not be read into the court's correction, which unambiguously admits "we erred." *Sarausad*, 109 Wash. App. at 837, 844, 39 P.3d at 315, 319. The earlier Court of Appeals' erroneous understanding of accomplice liability, *see State v. Ronquillo*, 1998 WL 87641, at *9 (Wash. Ct. App. Mar. 2, 1998), did not affect the underlying jury instructions, which the later Court of Appeals deemed valid under a corrected view of the law, *see Sarausad*, 109 Wash. App. at 844, 39 P.3d at 319 (finding that "the accomplice liability instructions were sufficient, and nothing that the prosecutor argued to the jury required a remedial or supplemental instruction from the trial court"). Although the court's view of the applicable law changed, neither the existence nor the content of the second decision reveals ambiguity as to Sarausad's jury instructions.

Moreover, there is no inconsistency in the Washington Court of Appeals acknowledging its own error but reaching

the same judgment. *See* Maj. Op. at 2588. Under the Court of Appeals' initial reading of the statute, the instructions were correct. On reconsideration, the court had to determine whether those same instructions would satisfy a stricter reading of the statute, which they plainly did. In effect, the instructions would have satisfied *either* reading of the statute, although the *prosecutor* would have had grounds for objecting to the instructions at trial on the grounds that the instructions were too restrictive under the court's original (and erroneous) reading of the statute. The Washington Court of Appeals did exactly what it was supposed to do in this case.

## IV

Even if the instructions given here were ambiguous, it was not objectively unreasonable under clearly established Supreme Court law for Washington courts to conclude that the instructions were correct and fair. *See* 28 U.S.C. § 2254(d)(1). We can only applaud the Washington courts for admitting their prior error and reconsidering their judgment in Sarausad's case. There is nothing in the decisions of the U.S. Supreme Court that should have alerted those conscientious courts that they were violating the Constitution when they did so. Yet, effectively, the majority is prepared to tell the Washington courts that it was fine to admit error, and that it was fine to reconsider the judgment based on a revised understanding of Washington law, but that Washington courts should not have been trusted with Washington law because their judgment on reconsideration is "objectively unreasonable."

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we may grant habeas relief only if "the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Court has explained that "an unreasonable application of fed-

eral law is different from an incorrect application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000) (emphasis omitted). Accordingly, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, "[a] state-court decision involves an unreasonable application of [the] Court's clearly established precedents if the state court applies [the] Court's precedents to the facts in an objectively unreasonable manner." *Brown v. Payton*, 544 U.S. 133, 141 (2005); *see Sims v. Rowland*, 414 F.3d 1148, 1151-52 (9th Cir. 2005).

Specifically, "[a] state court decision is 'contrary to' clearly established Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases *or* if the state court confronts a set of facts materially indistinguishable from those at issue in a decision of the Supreme Court and, nevertheless, arrives at a result different from its precedent." *Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir. 2004) (citing *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)) (other citations omitted). The "objectively unreasonable" standard of § 2254(d)(1) imposes a "highly deferential standard for evaluating state-court rulings" and "demands that state court decisions be given the benefit of the doubt." *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003). Our inquiry begins and ends with the state court's determination, and affords it great deference in the process. Synthesizing these principles, to grant habeas relief under AEDPA, we must, first, identify a clearly established holding of the U.S. Supreme Court and, second, demonstrate that the state court's application of that holding is objectively unreasonable. *See Penry v. Johnson*, 532 U.S. 782, 792-93 (2001).

The majority musters two cases, *Estelle v. McGuire*, 502 U.S. 62 (1991), and *In re Winship*, 397 U.S. 358 (1970), for the proposition that an ambiguous jury instruction violates due process because it may "relieve[ ] the State of its burden

to prove every element of the crime beyond a reasonable doubt." Maj. Op. at 2584. As a statement of general law, the proposition cited by the majority is not to be doubted. In this case, however, the proposition is not particularly useful because it is so general, and neither *Estelle* nor *In re Winship* provides any guidance for determining what is an ambiguous instruction and at what point the ambiguity is of constitutional magnitude. *See Victor v. Nebraska*, 511 U.S. 1, 5 (1994) ("Although [*Winship* states] an ancient and honored aspect of our criminal justice system, it defies easy explication.").[6] The majority quotes from *Estelle*, 502 U.S. at 72 ("[I]n reviewing an ambiguous instruction such as the one at issue here, we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution.") (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)), *see* Maj. Op. at 2573, but omits the sentence that followed it: "we also bear in mind our previous admonition that we 'have defined the category of infractions that violate 'fundamental fairness' very narrowly,' " *id.* at 2573 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

The majority now claims that the statute itself is ambiguous and "that an instruction quote[d] from a statute does nothing to make either the statute, or the instruction, more understandable." Maj. Op. at 2588. The majority follows this statement with citations to cases in which specific intent in federal statutes was relevant. *See id.* at 2588-90. However, these cases are not helpful here because they tell us nothing about the Washington instructions at issue. More revealing is the step the majority does *not* take. While claiming that the Washing-

---

[6]If *In re Winship* has clearly established anything, it is that the state must prove every element of the offense beyond a reasonable doubt, including juvenile proceedings. *See* 397 U.S. at 363-64, 368. Sarausad does not contend, nor do I understand the majority to challenge, that the jury was not properly instructed with respect to *proof beyond a reasonable doubt. See Victor*, 511 U.S. 1 (considering the constitutionality of variations on that standard). I am not sure that citation to *In re Winship* contributes anything to Sarausad's particular challenge under AEDPA.

ton statute is ambiguous, the majority stops well short of claiming that the statute is unconstitutionally vague. Effectively, the majority suggests that the instructions could be improved and that this infirmity alone is sufficient to bring this case within *Estelle* or *In re Winship*.

Contrary to the majority's point is the Supreme Court's recent decision in *Brown v. Payton*, 544 U.S. 133 (2005). In *Brown*, a California death penalty case, the trial court gave a "catchall instruction" ("factor (k)") in the penalty phase that "repeated the text of the statute." *Id.* at 137. Payton asserted the instruction was ambiguous because it did not advise the jury that they could consider his postconviction conduct and because the prosecutor had misstated the law in his argument to the jury. *See id.* at 138-39. The California courts denied Payton relief, but we granted his petition for habeas relief under AEDPA because the trial court failed to correct the prosecutor's misstatement and because the "instruction was likely to have misled the jury and it was an unreasonable application of th[e] Court's cases for the California Supreme Court to have concluded otherwise." *Id.* at 138-39, 141. The Supreme Court reversed our judgment. Relying largely on *Boyde v. California*, just as the majority does here, *see* Maj. Op. at 2573-74, the Court observed that even if the California court's "conclusion was incorrect, it was not unreasonable, and is therefore just the type of decision that AEDPA shields on habeas review." *Id.* at 143.

Even accepting the broad statement from *Estelle* as "clearly established" law, the majority cannot, by any metric, demonstrate that the Washington courts' judgment in this case was an "objectively unreasonable" application of the Court's precedents in *Estelle* and *In re Winship*. As I have demonstrated, *supra*, there is not even a genuine ambiguity in the Washington instructions, much less one that is so obvious that it is "objectively unreasonable" of the Washington courts to neglect to correct it and requires our intervention. The majority has no cases to support its proposition, and no basis for its

conclusion other than its own *ipse dixit*. In the end, the majority does not offer anything other than its own opinion to support its conclusion that the instruction is ambiguous. *See* Maj. Op. at 2590. Improving Washington's jury instructions is a noble enterprise, but it is not authorized by AEDPA.

V

Even if I thought there was some ambiguity in the instructions and that the Supreme Court's jurisprudence was sufficiently clear, I could not find that "there is a 'reasonable likelihood' that the jury misapplied the ambiguous jury instructions." Maj. Op. at 2593 (quoting *Estelle*, 502 U.S. at 72). The majority makes much of the fact that the jury asked the court three questions about the jury instructions during its deliberation. *See* Maj. Op. at 2592. But each time the jury asked a question, the court directed the jury's attention to the precise paragraph of a constitutionally adequate instruction. It is hornbook law that "[a] jury is presumed to follow its instructions . . . and is presumed to understand a judge's answer to its question." *Weeks*, 528 U.S. at 234. As the Supreme Court noted, "[t]o presume otherwise would require reversal every time a jury inquires about a matter of constitutional significance, regardless of the judge's answer." *Id.* The majority takes us one step closer to this reality.

The majority points to several concerns to rebut this presumption, but none comes close to kind of evidence needed to nullify the jury's verdict. First, the majority concludes that the "reasonable likelihood" standard is met because "the evidence against Sarausad was thin." Maj. Op. at 2591. This is a remarkable leap of logic to posit that there is a causal relationship between the strength of the government's case and the probability of jury confusion. The majority's assertion finds no support in the record, and there is simply no precedent in any court, let alone clearly established law of the Supreme Court, to suggest that a jury is more likely to misunderstand its instructions *because* the government's case is pur-

portedly weak. We have previously concluded that an instructional problem is compounded by the thinness of the evidence, *see Lankford v. Arave*, 468 F.3d 578, 586-89 (9th Cir. 2006), but we have not, as the majority does here, used the thinness of the evidence to prove the existence of the instructional problem.

Second, the majority highlights that the prosecutor "clearly and forcefully" argued an " 'in for a dime, in for a dollar' theory of accomplice liability." Maj. Op. at 2591. But the majority cannot know the impact of this argument on the jury, other than the fact that the jury returned a guilty verdict and the majority doubts that conclusion. Even if the prosecutor's statements were incorrect as a matter of Washington law, the majority cannot avoid the fact that the jury was properly instructed and that we presume that the jury understood and followed those instructions. *See Weeks*, 528 U.S. at 234; *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).[7] While prosecutorial misconduct may be independent grounds for overturning a conviction, mere misstatements have no place in an inquiry into whether the jury was properly instructed (*Weeks*) or whether the instructions were ambiguous (*Estelle*). The majority cites no cases to support its theory, much less clearly established precedent from the Supreme Court.

Third, the majority asserts that "in its notes sent to the judge during deliberations, the jury demonstrated substantial confusion about what the State was required to prove." Maj. Op. at 2592. But juror questions in and of themselves are not evidence of constitutional error. *See Weeks*, 528 U.S. at 234-

---

[7]The presumption "is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant." *Richardson*, 481 U.S. at 211. As such, the presumption favors the state when the instructions are correct and favors the defendant when the instructions are in error. *See, e.g.*, *Martinez v. Garcia*, 379 F.3d 1034 (9th Cir. 2004).

36. Rather, the relevant inquiry is whether the trial court properly responded to the jury's questions, which it did.

On the third day of its deliberations, the jury requested "clarification on instruction No. 11 & 12 Element (3); does the 'intent' apply to (the defendant only) or to (the defendant or his accomplice)?" Instructions 11 and 12 were the first-degree murder instructions, and not the accomplice liability instructions, which were 46 and 47. The judge then pointed the jury to the latter: "Refer to instructions 46 and 47 and consider your instructions as a whole." There was nothing erroneous about the judge's response, as he directed the jury to the specific instructions (35 instructions later) regarding accomplice liability as related to first-degree murder.

Three days later, on the sixth day of its deliberations, the jury sent the court the following note:

> Reference: Instruction 17 in "the crime of murder in the second degree (intentional)." Question: Does intentional apply to only the defendant or only his accomplice?"

The judge responded that the jury should "[r]efer to instructions 45 & 46 and consider the instructions as a whole." Instructions 45 and 46 were the accomplice liability instructions for the second-degree murder charge. There was nothing erroneous about the judge's response this time either, as he directed the jury to the specific instructions (28 instructions later) regarding accomplice liability as related to second-degree murder.

Finally, on the seventh day of deliberations, the jury sent the following note:

> We are having difficulty agreeing on the legal definition and concept of "accomplice." Question: When a person willing[ly] participates in a group activity,

> is that person an accomplice to any crime committed
> by anyone in the group?

The judge again instructed the jury to "[r]eread instructions # 45, 46, 47 and 48, and consider your instructions as a whole." There was nothing erroneous about the judge's response, as he directed the jury to the specific and unambiguous instructions regarding accomplice liability.

The jury's questions are certainly understandable given the facts, the complexity of the issue, and the length of the jury instructions. The questions were discerning ones and demonstrate that the jury was proceeding deliberately and methodically. The questions were not the same inquiry repeated three times. The first question related exclusively to accomplice liability and *first*-degree murder, while the second question—raised three days later—related exclusively to accomplice liability and *second*-degree murder. The fact that the jurors deliberated for two full days before asking the second question indicates that the jury considered accomplice liability for the first-degree murder charge, and then moved on to the second-degree murder charge. These questions do not demonstrate a complete misunderstanding of accomplice liability.

To my mind, the third question is the only one that even potentially illustrates that the jury experienced some confusion on this issue. And we know that the jury had a difficult time agreeing on a definition of accomplice liability because it said so. There is nothing wrong with that; we permit juries to ask questions precisely so that a judge can direct them to the answer. The trial court performed by the book, directing the jury's attention to the relevant accomplice liability instructions, which were unambiguous and correct statements of Washington law. The following day the jury returned a verdict. Under *Weeks*, our inquiry ends there.

Moreover, there is other evidence that shows that the jury was satisfied with the judge's directions and reached a reli-

able verdict. The jurors deliberated for some time after the judge's responses. *See Weeks*, 528 U.S. at 235 ("It is also significant . . . that the jurors deliberated for more than two hours after receiving the judge's answer to their question."). Further, "[t]his particular jury demonstrated that it was not too shy to ask questions, suggesting that it would have asked another if it felt the judge's response unsatisfactory." *Id.* at 235-36.

Fourth and finally, the majority points again to the prosecutor's "in for a dime, in for a dollar" argument, and suggests that "the Washington courts were able to deny Sarausad's PRP only after misstating the record and ignoring th[at] argument." Maj. Op. at 2592. However, the majority gives too much weight to its asserted chronology. Although accomplice liability was clarified in *Roberts* and *Cronin*, these cases did not rewrite Washington law. Rather, cases such as *Davis* established the requirement that an accomplice must have knowledge of the intended crime, and the jury instructions at Sarausad's trial reflect that long-standing principle. *See supra* at 2615 n.5. Therefore, the Washington courts were not in the position, as hinted by the majority, of needing to misstate the record to deny Sarausad's petition under changed law. Moreover, it is the province of these various Washington authorities to decipher the arguments made at Sarausad's trial. Although the majority may opine that "the prosecutor repeatedly made precisely the argument that the Court of Appeals and the Court Commissioner stated she did not make," Maj. Op. at 2593, this conclusion is not for us to draw. Accepting the ultimate characterization by Washington authorities, I would find that the jury was properly instructed and, therefore, there is not a "reasonable likelihood" that the jury applied the instructions in an unconstitutional manner.[8]

---

[8]I object to the majority's sub-silentio reliance on post-deliberation affidavits from repentant jurors. *See* Maj. Op. at 2579. Although the majority ultimately disclaims reliance on the affidavits, *see id.* at 2593, the majority protests too much. Even mentioning the affidavits is objectionable for all

\* \* \* \* \*

In sum, the Washington courts' rulings are not "contrary to . . . clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). Sarausad's jury was properly instructed, and we are required to find that they followed their instructions, even when the case is close. I would reverse the judgment of the district court.

I respectfully dissent.

---

the reasons the *Federal Rules of Evidence* have emphatically rejected a juror's "testi[mony] as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions." FED. R. EVID. 606(b). We have held, for example, that Rule 606(b) "bars consideration of jurors' statements that they ignored the court's instructions and discussed a defendant's failure to testify during deliberations." *United States v. Rutherford*, 371 F.3d 634, 640 (9th Cir. 2004); *see also United States v. Falsia*, 724 F.2d 1339, 1343 (9th Cir. 1983). This "buyer's remorse" has the potential to turn justice on its head, as individual jurors, pursued by counsel and pressured to explain the verdict, are turned into witnesses and advocates.